R. GAERTNER & CO., INC., ET AL. v. UNITED STATES

DECAL PRODUCTS CO. v. UNITED STATES
UNITED STATES v. DECAL PRODUCTS CO.

**No. 5445.**—Invoices dated Nuremberg, Germany & Hofgohlenau, Germany, March 7 and April 1, 1938, etc.
Certified March 9 and April 2, 1938, etc.
Entered at New York March 31 and April 13, 1938, etc.
Entry Nos. 835100 and 111554, etc.

(Decided September 26, 1941)

*Strauss & Hedges* (*Eugene F. Blauvelt* of counsel, and *Barnes, Richardson & Colburn*, by *J. Bradley Colburn* and *Samuel M. Richardson* of counsel) for the importers.

*Paul P. Rao*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the United States.

KINCHELOE, Judge: The merchandise involved in the appeals to reappraisement listed in schedule A, attached hereto and made a part hereof, all of which were consolidated for the purposes of trial by consent of the parties, consists of certain ceramic prints or decalcomanias imported from Germany during the years 1936, 1937, 1938, and 1939.

Similar merchandise was the subject of the decision in the case of *Decal Products Co. et al.* v. *United States*, Reap. Dec. 4748 (affirmed in Reap. Dec. 5017), the record in which case was incorporated herein on motion of counsel for importers, and admitted as plaintiffs' exhibit 1.

Included in the incorporated record is a stipulation entered into between counsel for the respective parties, wherein it is agreed, in substance, as follows:

(1) That certain decalcomanias were sold and freely offered for sale to all buyers in the ordinary course of trade, in the usual wholesale quantities of 50 sheets, in the principal markets of Germany, for home consumption and for export to countries other than the United States, at prices which were at the times of exportation of the instant merchandise the same as the appraised values of the decalcomanias covered by the appeals to reappraisement involved herein, and that such appraised values constitute the dutiable foreign values if I find that foreign value is the proper basis of appraisement for the merchandise at bar.

(2) That certain other decalcomanias, not identical with those just referred to, but which are the subject of the importations covered by the appeals to reappraisement before me, are and were at the times of exportation of the instant merchandise sold and freely offered for sale in Germany to all purchasers in the ordinary course of trade, in the usual wholesale quantities of 2,000, in the principal markets of Germany, but only for exportation to the United States at prices which are and were at the times of such exportations the same as the unit entered values, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced, and that such values constitute the dutiable export values, if I should find that export value is the proper basis for appraisement of the instant merchandise.

By virtue of the said stipulated facts, it is my view in the present case as it was in the previous one, that the issue before me has been narrowed to the sole question whether the decalcomanias sold or freely offered for sale in Germany for home consumption or for export to countries other than the United States are similar, within the meaning of that term for the purposes of finding dutiable value as used in section 402 of the Tariff Act of 1930, to the decalcomanias covered by the appeals to reappraisement before me. Depending on whether

or not I find that the two types of decalcomanias are similar, within the judicial interpretation of that term for appraisement purposes, there is concededly before me a proper dutiable foreign value as represented by the appraised values, or a proper dutiable export value, as represented by the unit entered values, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced.

In support of their contention that the imported decalcomanias are dissimilar to those manufactured for the foreign markets, the importers herein offered documentary evidence and oral testimony of witnesses, as well as pieces of decorated ware showing the results after applying the different types of decalcomanias under manufacturing conditions here and in Germany.

The documentary evidence submitted by the importers consists of seven affidavits, three of which are from manufacturers of decalcomanias in Germany, and four from managers of German factories that manufacture porcelain and use decalcomanias in the process of producing such ware.

The affidavits of the German manufacturers of decalcomanias, collective exhibits A–1, A–2, and A–3, were executed by persons connected with the exporting firms of the merchandise at bar, all of whom, as shown by their qualifications set forth in said affidavits, are thoroughly familiar with the manufacture of decalcomanias in Germany. It appears from said affidavits that there are two types of decalcomanias manufactured in Germany, to wit, a so-called simplex type which is made for use in Germany, and a so-called duplex type that is manufactured exclusively for export to the United States; and that the two types differ in their essential characteristics. The so-called simplex type, under a decree of the German government issued in 1935, is, and must be, produced of entirely German-made materials, consisting of a specially manufactured paper with an adhesive coating, known as simplex or meta paper, and hard colors containing little or no flux (an average of 1 per centum) that are capable of withstanding a firing temperature of 1,382° F., to 1,562° F. The duplex type decalcomania is made of materials which are imported from England with the permission of the German government and with the understanding that they are to be used exclusively in the manufacture of decalcomanias for export to the United States. The paper of the duplex type is a specially made English duplex paper consisting of two sheets, an upper sheet, which is thin and transparent and carries a thin adhesive layer which serves at the same time as a support or carrier of the color and on which the design is printed, and a lower sheet, which is known as the backing and consists of heavy paper or matrix. The colors in the duplex type are soft colors containing an average of 10 per centum flux

to allow them to fire satisfactorily at a firing temperature not to exceed 1,292° F. It further appears from said affidavits that each of the two different types of decalcomanias is specially adapted for use in the market where it is sold; that the German simplex type has never been successfully sold to customers in the United States; and that the duplex type cannot be used for the decoration of pottery manufactured in the German market. Samples of both types of decalcomanias are attached to all of said affidavits, the duplex type attached thereto having been properly identified by the appraiser as representative of the merchandise at bar.

In each of the four affidavits, collective exhibits B, C, D, and E, from German porcelain manufacturers, the affiant has described the method of transferring the German simplex type of decalcomania to porcelain under factory operations applied in Germany. The description is substantially the same in each of said affidavits, and is set forth in the affidavit of Herman Rudolph, manager of the porcelain factory of C. Tielsch & Co., collective exhibit B, as follows:

The sheet of ceramic color prints used is covered with a varnish, a so-called transfer varnish, and after this varnish has reached a certain consistency, it is transferred to the porcelain. The piece of porcelain itself is also coated with transfer varnish prior to the printing. The transferred sheet is thoroughly moistened with a sponge until the paper which is the carrier of the decoration, separates and the color now adheres to the porcelain article. Thereupon the residue of gum still adhering to the porcelain article is removed by careful washing and rinsing and the porcelain article is set aside to dry. These porcelain articles which are then ready for baking, are caused to fuse in a so-called muffle furnace at a temperature up to 850° C.

The testimony in each of said affidavits is cumulative to the effect that the duplex type of decalcomanias cannot be used in the German market because the colors used therein will not withstand the high baking or firing temperature employed in German plants. To support such testimony, each of the affiants attached to his affidavit five plates to which were transferred certain decalcomanias of both of said types.

The oral testimony adduced by the importers was offered by witnesses connected with the pottery and earthenware industry in this country, which, it appears from the record, uses practically all of the imported duplex decalcomanias. The witness Duhrssen, president of Decal Products Co., and the witness Pickin, president of Palm, Fechteler & Co., both of which concerns are importers herein, have been engaged in the decalcomania business for upwards of 20 years, and are familiar with the manufacture of decalcomanias in Germany, having visited factories there and observed the manufacturing processes. Their testimony in this connection is corroborative of the same line set forth by the German manufacturers in their affidavits, collective exhibits A–1, A–2, and A–3. Both of said

witnesses further testified that the German simplex type is not acceptable and cannot be used by American potteries because it is not adaptable for transfer on the ware manufactured in their plants.

The witness Duhrssen further testified that approximately 80 per centum of the pottery manufacturers in this country using decalcomanias are located in the East Liverpool district in Ohio; that he has visited those plants for at least once a month for the past 19 or 20 years; and that during such visits he has observed their factory methods, talked with people in the plants, and personally applied decalcomanias to ware. Describing the method by which American potteries use decalcomanias on their ware, said witness testified as follows:

When the American potteries want to decorate ware, they take duplex paper sheets and strip this thin film from the backing, and they take anywhere from 30 to 50 sheets and superimpose them on each other. So they can cut from 30 to 50 or 60 sheets at a time. The ware to be decorated is then coated with a thin film of varnish. It goes through a process where one girl puts on the varnish and the ware passes through a tunnel with a fan in it, where the varnish is dried sufficiently so the next girl, who has a bundle of 30 to 50 of these sprays cut out, places the decalcomania on the ware where the varnish has been applied, and it passes along on a belt to the next girl who has a rubbing brush, who rubs the decalcomania in position. And from there it goes in the machine washer and drier, also a conveyor system so that when it comes out of the washing and drying machine, it is ready to be put in the kiln for firing.

Differentiating the method of transferring the simplex type of decalcomania as employed in the German market from that used in this country in transferring the duplex type, the said witness further testified:

In Germany, the girl is given one of these single paper sheets and she covers it with varnish, and sometimes she also varnishes the ware to which this is to be applied and then takes the sheet and cuts one individual design and places it on the ware herself. And she takes a sponge with some water and then soaks the paper until it comes off, and then smooths over the varnish again with clean water and sets it aside to dry. The most outstanding difference is the fact that the sheet is varnished instead of the ware being varnished as we do in this country, and then the fact they cut one design at a time which is a slow process whereas we have a mechanized process in this country.

It was further developed in the testimony of the said witness Pickin that customers in this country order the imported duplex decalcomanias under specifications providing that they be on English duplex paper and with soft colors suitable for firing at a temperature not to exceed 1,350° F. which is absolutely essential to suit the grade of ware used in the United States.

There was some testimony brought out by counsel for the Government on cross-examination concerning the use of certain so-called German duplex paper in decalcomanias imported here. Such testimony, however, has no materiality herein since it was shown that

said German duplex paper decalcomanias were imported into this country only for a limited time which was prior to the period covered by the importations in question; and that it was then only when German manufacturers were unable to get any of the English duplex paper.

To show the requirements of American potteries in their use of decalcomanias and the method of their application in such plants, importers introduced the testimony of three witnesses, all of whom are managers of the decorating departments of manufacturers of pottery—the three largest concerns manufacturing pottery in the United States and users of decalcomanias—whose testimony appears herein as representative of manufacturiug processes as they are employed in all potteries in the United States. The testimony of said witnesses is cumulative to the effect that duplex decalcomanias are exclusively used in their respective plants; that such decalcomanias require soft colors containing a certain percentage of flux so they will mingle or integrate with the glaze of their decorated ware which is fired at a temperature not in excess of 1,350° F.; and that hard colors cannot be used because they will not fire at such limited temperature which is absolutely essential to prevent what is called a "spit-out," that causes the glaze to bubble and give a sandpaper texture to the ware thereby rendering it unmarketable as a commercial product.

Said witnesses further testified that they received samples of the German simplex decalcomanias from those attached to the affidavits, said collective exhibits A–1, A–2, and A–3; and that they attempted to use said samples in their plants under factory conditions that exist when transferring the duplex type in the manufacture of their decorated ware. Typical of the testimony of all the witnesses concerning the use of said samples is the following description given by the witness Brooks, head of the decorating department of Homer, Laughlin China Co., the largest manufacturer of pottery in this country:

After we had applied the varnish to the ware and it became tacky enough to accept the print, we used the simplex paper and in putting it on, it would not stay. In other words, when we take the duplex paper and put it on, it stays and adheres to the varnish, while with the use of this simplex paper it would not stay down, and in doing that it mutilated the print to some extent, and in rubbing we had to rub it harder to make it adhere to the ware, and in the washing process, it would not release from the ware.

Concerning the result obtained from the use of said German simplex decalcomanias on their ware, the combined testimony of said witnesses is to the effect that the colors in said simplex decalcomanias were underfired; that they would not mingle with the glaze of the ware and became dull and faded, and that the resultant product was not of marketable quality. To substantiate their testimony concerning

the impracticability of using German simplex decalcomanias for the decoration of their ware, each of said witnesses produced pieces of earthenware, which were admitted in evidence as illustrative exhibits, to which had been transferred both types of decalcomanias under the normal operating conditions of their decorating departments. Each witness identified certain of both types as they appeared on the illustrative exhibits and pointed out the defects in the simplex decalcomanias as they were transferred to the ware and compared them with the satisfactory and marketable quality of the ware with the duplex type transferred thereon. When shown the samples of ware attached to the affidavits of German manufacturers, collective exhibits B, C, D, and E, with duplex decalcomanias transferred thereon under factory conditions prevailing in Germany, said witnesses testified, in substance, that all of the decalcomanias were overfired; that the colors were burned away; and that they are not commercial marketable products.

Based upon the evidence offered by the importers and, as just outlined, which constituted the entire record in the *Decal Products Co.* case, *supra*—the Government having offered no proof in the prior case—this court stated,

that both of said types of decalcomanias are comprised of specially made materials; that the materials used in each type are essentially different; and that the materials employed in each type are particularly selected to render the respective articles available as commercial products in the market where the individual type is sold. The German simplex paper and the German hard colors used in the German type decalcomanias make such articles particularly fitted for factory operations as they prevail in the German market. The English duplex paper, demanded by American pottery manufacturers, is used in the American type of decalcomanias to suit what the witness referred to as the "mechanized process" of transferring decalcomanias to decorated ware that is employed in this country, and are not adaptable for use in the slower process followed by the German manufacturers. The soft colors, containing approximately 10 per centum flux, used in the American type decalcomanias, are specially prepared to suit the firing temperature applied to the decorating kilns in American plants so that the colors will properly fuse with the glaze on American ware. It is clear from the record before me, in my judgment, that the American type decalcomania is adaptable for use and is actually used only by American manufacturers of pottery in this country; that said type cannot be used in the manufacture of decorated ware in German factories; that the German type decalcomania is used exclusively in the German market in connection with the manufacture of decorated ware; and that said type is not susceptible of use and will not be accepted by manufacturers of such ware in this country.

In the instant case, however, the Government offered the testimony of fifteen witnesses, whose testimony was directed solely toward contradicting the proof adduced by importers on the issue of similarity involved herein. The commercial witnesses introduced by the Government are connected with the china industry in this country, and to a great extent, with the branch of that industry that manu-

factures vitrified overglazed dinnerware. Evidently, the purpose of submitting testimony of persons connected with the china industry, which, it appears of record, is regarded as separate and distinct from the earthenware industry, was to show that decalcomanias, the same as or similar to the merchandise at bar, are used in said industry where they are fired at a temperature higher than 1,350° F., the maximum temperature employed in the earthenware industry, as stated by importers' witnesses. In this connection, the Government's evidence of probative value relates entirely to duplex decalcomanias, and, in my opinion, it does not affect to any material degree the very thorough and exhaustive proof offered by the importers. So far as evidence offered by the Government concerning simplex decalcomanias is concerned, the testimony of its witnesses not only fails to refute that of importers' witnesses, but such proof supports in a large measure the testimony adduced by the importers along the same line. Referring to simplex decalcomanias, the Government's witnesses testified, in substance, that said type is too hard to work with; that it is not practical to use in their plants; and that, in the ordinary course of trade, a delivery of simplex decalcomanias would not be accepted on an order for the duplex type.

The first witness called by the Government was one Max Leithold, a manufacturer of decalcomanias. His testimony is wholly incompetent, in my judgment, for the purposes of this case, since it relates exclusively to decalcomanias made in this country, the witness having stated that his only experience with imported duplex decalcomanias was of an experimental nature.

The testimony of Government's witness Nathan Zank, treasurer of the Atlas China Co., concerning the firing of three German plates, defendant's exhibits 3, 4, and 5, with decalcomanias obtained from from some of the instant importations fairly supports the testimony of importers' witnesses. With respect to said exhibits, the record discloses that the Government examiner delivered to said witness' plant three plain or undecorated plates taken from shipments received from Germany and certain samples of the merchandise at bar; that the samples referred to were fired on the three German plates, said defendant's exhibits 3, 4, and 5, at a temperature of 1,328° F. Since the witness offered no testimony relating to the character of the said German ware, it seems fair to assume that the said plates were manufactured in the German market with the proper glaze for transfer of duplex decalcomanias which, as shown by the record, are manufactured there exclusively for export to this country. Said witness' testimony that the American plate, defendant's exhibit 7, was fired with samples of the instant merchandise at a temperature of 1,328° F., fully corroborates that of importers. Concerning the simplex decalcomanias, defendant's collective exhibit 8, and their transfer to the

ware, defendant's exhibits 9 and 10, said witness' testimony lost whatever force and effect it may have had when it was developed by counsel for importers that said simplex decalcomanias were sold by Philip Tatler, one of Government's witnesses, to the Atlas China Co. at sacrifice sales as obsolete stock, said articles having been obtained by the said Tatler over 20 years ago. Certainly, simplex decalcomanias produced over 20 years ago are not to be compared for tariff purposes with the simplex decalcomanias manufactured in Germany between the years 1936 and 1939, the period with which we are concerned herein. Referring to his experience with simplex decalcomanias, said witness stated that they are hard to work with, and that he would not accept, in the ordinary course of business, a delivery of the simplex type on an order for duplex decalcomanias

Government's witness Fischel, who is connected with the dinnerware department of the Jackson Vitrified China Co., testified that said company has been using German duplex decalcomanias since May, 1939, when they began to produce vitrified overglazed dinnerware; that such dinnerware is manufactured with a hard glaze on the bisques; and that duplex decalcomanias are transferred thereon at a temperature anywhere from 1,450° to 1,550° F. In the light of the qualifications of said witness, his testimony has very limited value. He admitted that he never fired any decalcomanias, but merely observed results; and that it is no part of his duties to pass on the finished decorated ware produced by his company. Explaining his duties he stated:

I take care of all correspondence, entering and checking orders, and also recommend the purchasing of decalcomanias, see trials, etc.; in other words, all duties connected with the dinnerware department.

Thus it will be observed that the witness' position is largely administrative; and that he has nothing to do with the manufacturing operations of his company's plant.

The next witness called on behalf of the Government was Robert Arthur Bryant, Treasurer of the Onandaga Pottery Co., who testified, among other things, that he has charge of the decorating at the Fayette Plant of that company, in which capacity he supervises all the work performed in decorating vitrified overglazed dinnerware produced by that company. Said witness testified that throughout his experience of upwards of 10 years he has exclusively used duplex decalcomanias; that he purchased such type from the importers herein; and that he used them in the production of vitrified overglazed dinnerware to which they were fired at a temprature ranging between 1,410° to 1,430° F. Defendant's exhibits 13 to 18, inclusive, were identified by said witness as German duplex decalcomanias which he had purchased from some of the importers before the court, and which he had transferred to dinnerware made at his plant at the

temperature previously stated. The witness further testified that the output of vitrified overglazed dinnerware, during the period covered by the instant importations, was merely 5 to 10 per centum of the output of earthenware, and he distinguished the two industries by stating that the method of manufacture followed in each is different, which results in different degrees of refinement in the body of the ware and requires different firing temperatures for the transfer of decalcomanias employed in each of said industries. The large difference in the output of the finished wares of both industries, as testified to by said witness, lends support to the testimony offered by importers to the effect that the earthenware industry uses the great majority of duplex decalcomanias imported from Germany, the witness Pickin having stated that 95 per centum of his customers are producers of earthenware.

The representative of the Lenox Pottery Co., who appeared as a witness on behalf of the Government, stated that said company used two patterns of German duplex decalcomanias made according to specifications, which he referred to as "tailor-made." Explaining the term "tailor-made," the witness testified, in substance, that a piece of his company's china was sent to the German manufacturer so that the colors of the decalcomanias could be tested to the glaze to insure satisfactory transfer at the temperature of 1,425° F., used by his company in their production of vitrified overglazed dinnerware. German duplex decalcomanias, made according to specifications to suit the requirements of a particular china manufacturer in this country, are not articles freely offered to all purchasers in the foreign market for export to this country, and therefore any testimony relative thereto cannot be considered in determining the issue presented herein. Said witness explained the use in his plant of decalcomanias with little or no flux by testifying that his company produces decorated ware with a very soft glaze; and that their practice is to fuse the color in the glaze with the use of little or no flux. As to the practicability of using simplex decalcomanias, the witness further testified that he found them too hard to handle; and that he ' wouldn't want to use them." Specifically, his testimony on that point is as follows:

X Q. For your particular factory you found you could not use the simplex decalcomanias?—A. We would go out of using decalcomania patterns if we had to use simplex.

Judge KINCHELOE. You mean out of the decalcomania business?

The WITNESS. Using them on our china, yes.

The testimony of the Government's witness Hellman has no probative value herein since it referred entirely to duplex decalcomanias manufactured by the Rosenthal factories in Germany for their own use, and nothing was offered to establish a basis of similarity between them and the articles in question.

Government's next witness, John P. Boyles, is connected with the Shenango Pottery Co. as decorating supervisor. The duplex decalcomania, defendant's exhibit 23, being one which the previous witness had stated was made by the Rosenthal factories in Germany for their exclusive use, this witness' testimony in connection therewith is entitled to no weight for the reason heretofore given. Nor has said witness' testimony with reference to simplex decalcomanias any probative value, since it relates to such articles used by his plant 10 years ago, a period too remote for consideration in the instant case.

D. William Scammell, engaged in the china manufacturing business for over 40 years and representing the Scammell China Co., was the next witness who appeared on behalf of the Government. Said witness testified that, during the period covered by the importations at bar, he purchased German duplex decalcomanias from the importers herein; that such decalcomanias were used in the production of vitrified overglazed dinnerware which he manufactures with a hard glaze on the bisques; and that such decalcomanias were transferred to said decorated ware at a temperature of approximately, 1,430° F. Said witness' testimony with respect to the ware, defendant's exhibit 25, which he identified as being decorated with a simplex decalcomania was completely contradicted by testimony offered on behalf of the importers in their case on rebuttal. After said witness had testified that the decalcomania appearing on said exhibit 25 is a simplex type which he purchased from one Herbert Schulenburg, the latter was called as a witness on behalf of the importers. Said Schulenburg testified that the said decalcomania is an imported German duplex decalcomania for which he had the exclusive agency in this country; that he sold a shipment of the same to the Scammell China Co.; that the said company returned as unsatisfactory part of the shipment; and that thereupon the said decalcomanias were sold to and accepted by a plant producing earthenware. The Government's witness Scammell further testified with reference to the difference between the vitrified overglazed dinnerware industry and the earthenware industry, and his testimony on that point is substantially the same as the previous witnesses.

The last witness, who appeared on behalf of the Government was Philip Tatler, previously referred to in connection with testimony offered by the representative of the Atlas China Co. Said witness stated he has been engaged in the business of decorating ware for approximately 18 years, during the course of which he has used both simplex and duplex decalcomanias, including some purchased from the importers. Much of this witness' testimony supports statements made by those who appeared on behalf of the importers. The witness testified that the temperature at which a decalcomania is transferred depends entirely on the character of the ware to which it

is applied; that the difference between the firing temperature of earthenware and china is approximately 60 degrees, earthenware being fired at 1,360° F., and china at approximately 1,420° F. Concerning the paper of decalcomanias, the witness further testified that he is interested in its use as a carrier and for the proper application of the design to the ware. Referring specifically to simplex decalcomanias, the witness stated that he never used them for application to earthenware as they are impractical for such use, but that he has occasionally fired them to decorate china manufactured in his plant. Said witness' testimony with reference to the impracticability of using simplex decalcomanias, however, is in accord with that of the previous witnesses to the effect that they are hard to handle; that it has been necessary to apply a coat of flux to them to permit satisfactory transfer at lower temperatures; and that when they are used a higher price is charged because of the additional time required to decorate the ware. It appears from the record that defendant's exhibit 20 is an American plate to which has been fired certain German duplex decalcomanias that were delivered to said witness' plant by the Government examiner. With respect to said exhibit, the witness testified that he supervised the transfer of the decalcomanias thereon which were fired at a temperature between 1,410° and 1,420° F. The witness' statement, that the pattern marked S–11 appearing on exhibit 20 had been faded due to being fired at a temperature higher than that required for its proper transfer, fully supports the testimony of importers' witnesses that duplex decalcomanias will fade when fired at such high temperatures.

It is my judgment that the evidence introduced by the Government, as hereinabove outlined, is not sufficient to warrant any different conclusions than those reached in the *Decal Products Co.* case, *supra*, concerning the distinguishing characteristics of the two articles under consideration, previously set forth herein, and which I hereby adopt as my findings in the instant case.

Proceeding now to a consideration of the question of law presented herein, to wit, whether the doctrine of similarity for appraisement purposes, as judicially enunciated, shall be applied affirmatively or negatively to the two classes of merchandise in question, it should be stated at the outset that although this court and the Court of Customs and Patent Appeals have been frequently called upon to invoke that legal principle, there seems to be no definite rule that has been laid down and which is to be regarded as applicable to every case. In the case of *United States* v. *Irving Massin & Bros.* (16 C. C. P. A. 19, T. D. 42714), our appellate court interpreted the word "similar," as it is used in section 402 of the Tariff Act of 1930, as follows:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the

same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b).

And that construction was cited, and to some extent followed, in later decisions. *United States* v. *Wecker & Co.* (16 C. C. P. A. 220, T. D. 42837); *Scharf Bros. Co.* v. *United States* (16 C. C. P. A. 347, T. D. 43089); *Meadows, Wye & Co., Inc.* v. *United States* (17 C. C. P. A 36, T. D. 43324).

It will be observed that the above judicial interpretation embraces a number of elements by which similarity is determined, but no one case on the subject—and I have carefully reviewed all of the leading authorities—has been decided on the fact that a single element elicited by tests could serve to establish similarity. For example, both types of decalcomanias under consideration herein are ultimately used for the same purpose, to wit, for transferring patterns on to earthenware or chinaware to decorate such ware. But such fact, of itself, is not determinative of the issue presented here. Authority for that conclusion is found in the decision of our appellate court in the case of *United States* v. *Kraft Phenix Cheese Corp. et al.* (26 C. C. P. A. 224, C. A. D. 21). The question of similarity involved in that case concerned certain imported "Portion" Roquefort and so-called "Standard" Roquefort that was sold in the foreign market. Although the two classes of merchandise there involved are ultimately used for the same purpose—they are both eaten as Roquefort cheese—nevertheless the court held they were not similar within the meaning of that term as used in section 402 (c) of the Tariff Act of 1930, and in reaching its conclusion, stated:

It is conceded that "Standard" and "Portion" Roquefort cheese are made of the same materials. However, there is evidence to show that there is a difference in the method by which they are made. The record shows that the different cheeses are subjected to different degrees of heat. In addition, there is a difference in the salting, cave temperature, mould scraping and length of time in the curing process. The record for appellees shows that this difference of treatment results in a different kind of cheese. This conclusion is logical. The same initial materials may be used in the manufacture of many different things, the difference in the resulting product being caused by the varying treatment to which the materials have been subjected.

There is strong evidence that the "Standard" type crumbles when cut and that all Roquefort cheese shipped to this country must be capable of being cut into portions.

In a broad sense, of course, the ultimate use of both types may be said to be the same. They are both eaten as Roquefort cheese. But there is testimony to the effect that "Portion" cheese is made so that it may be cut satisfactorily and that otherwise it could not be used to make up portion packages.

As to adaptability to the same use, appellees' proof shows that the "Standard" Roquefort is not adapted to use or purpose for which "Portion" Roquefort was specially prepared after long research, i. e., capability of being smoothly cut.

With equal propriety the reasoning followed in the cited case may be applied in the instant case. In both types of decalcomanias under discussion here the initial materials are the same, to wit, paper and colors, but it is fairly established of record, in my opinion, that each of said materials used in the two articles is specially manufactured for the particular type in which they are used, and that the paper and colors used in the simplex type are essentially different from those used in the duplex. In my judgment, it is established by a preponderance of the evidence herein that the specially German manufactured simplex or meta paper and the hard colors used in the simplex type make such type particularly adaptable for use under manufacturing conditions as they prevail in the foreign market; and that the English manufactured duplex paper and soft colors are used in the duplex type to meet the requirements of the pottery industry of this country for which such duplex decalcomanias are exclusively manufactured.

The case upon which the Government seems to chiefly rely in support of its contention is that of *United States* v. *Thomas* (21 C. C. P. A. 254, T. D. 46788). But, as I view it, that case is easily distinguishable from the present one. There, it was shown by the record before the court that the imported paper tubes under consideration were made of the same material, made in substantially the same way, the cost of production did not materially vary, and to a certain extent, they were interchangeable in use with the comparable product sold in the foreign market. Here, the record is convincing, in my judgment, that the component materials, adaptability of use and actual use, of each type of decalcomania, are materially different. Also, the witnesses for the importers and those who testified on behalf of the Government, all agree that the simplex type and the duplex type are not interchangeable in use. Concerning the cost of production, the evidence before me is very meager, the only testimony in relation thereto being that elicited by counsel for defendant in his cross-examination of importers' witness Duhrssen. Said witness merely pointed out that the cost of a sheet of the simplex or meta paper used in the simplex decalcomanias exceeded the cost of a sheet of the English duplex paper used in the duplex type by approximately 1⅛ pfennig. Nothing was offered to show comparable costs of the different colors used in both types.

But it will be observed that in the *Thomas* case, *supra*, the court found:

\* \* \* equality in value and similarity in cost of production, *under the circumstances of this case*, were very pertinent and material considerations in determining similarity. [Italics mine.]

In the case of *United States* v. *Vietor & Achelis* (17 C. C. P. A. 412, T. D. 43864) the sole reason for holding goods dissimilar was because their values were different. In the case of *Scharf Bros. Co., Inc.* v. *United States* (16 Ct. Cust. Appls. 347, T. D. 43089) a difference in

cost of production was not permitted to be a bar to a finding of similarity. From the three cited cases, it seems clear that while equality in value and similarity in cost of production may be elements to be considered in a question of similarity of merchandise for appraisement purposes, the facts and circumstances in each individual case determine the pertinency and relative materiality of such elements. In view of the evidence before me, it is my opinion that relative values and comparable costs of production of the two kinds of decalcomanias under discussion have little bearing, if any, toward a proper determination of the present controversy.

For the reasons hereinabove set forth, and following the principles enunciated in the cited authorities, it is my opinion, and I so hold, that the imported merchandise covered by the appeals to reappraisement in question is not similar, within the judicial interpretation of that term as it is used in section 402 of the Tariff Act of 1930, to the comparable merchandise sold, or freely offered for sale, in the foreign market. The motion of counsel for defendant to dismiss said appeals is accordingly denied, and an exception to said ruling is allowed said counsel.

On the basis of the record before me, I find as matter of fact:

(1) That the merchandise in question consists of certain ceramic prints or decalcomanias imported from Germany during the years 1936, 1937, 1938, and 1939.

(2) That there was no foreign value, as such value is defined in section 402 (c) of the Tariff Act of 1930, for such or similar merchandise.

(3) That the proper basis of appraisement for said merchandise is export value, as such value is defined in section 402 (d) of said act.

(4) That said merchandise was at the time of exportation thereof sold and freely offered for sale in Germany to all purchasers in the ordinary course of trade, in the usual wholesale quantities of 2,000, in the principal markets of Germany, for exportation to the United States at the unit entered values thereof, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced.

(5) That the proper dutiable export values of said merchandise are the values set forth in finding of fact (4).

I therefore hold as matter of law that the proper basis for appraisement of the ceramic prints or decalcomanias covered by the appeals to reappraisement in question is export value, as such value is defined in section 402 (d) of the Tariff Act of 1930; and that such export values are the unit entered values, or the importers' claimed unit values on the items to which the importers added on entry because of advances made by the appraiser, plus cases and packing as invoiced. Judgment will be rendered accordingly.