PENSON & Co. *v.* UNITED STATES

No. 7970.—
Entry No. 717100.

(Order dated March 13, 1951)

*Barnes, Richardson & Colburn (Eugene F. Blauvelt* of counsel) for the plaintiff.
*David N. Edelstein,* Assistant Attorney General (*Chauncey E. Wilowski,* special attorney), for the defendant.

ORDER

RAO, Judge: The instant appeal for reappraisement involves the question of the proper value of an importation of certain merchandise, invoiced as "M. F. Sulphate Wrapping Paper," but, for the purposes of this case, conceded to be test or container board. The merchandise was entered at the invoice price of $95 per short ton, less the items of consular fee; forwarding and lading charges; inland freight; insurance, marine, and war risks; and ocean freight, and less estimated duty of $3,247.36, which is the claimed export value. Appraisement was made on the basis of foreign value at 13.10 Finnish markkaa per kilo, less 1 per centum, plus 11.1 per centum, packed.

Counsel for the plaintiff have agreed that if foreign value is found to be the proper basis for the appraisement of the instant merchandise then the value found by the appraiser is the correct foreign value, except for the 11.1 per centum addition, which the appraiser apparently levied to equal a Finnish sales tax. It is also admitted that the foreign value, if one be found to exist, would be higher than the export value upon which entry was made.

The Government, on the other hand, concedes that if the court finds export value to be the proper basis of appraisement, all of the above-enumerated charges are deductible, except the item of inland freight.

In addition to the foregoing concessions, the record before me consists of the oral evidence of Murray Boro, a partner in the firm of Ideal Container Co., the ultimate consignee herein, which manufactures corrugated containers, a sample of the imported merchandise, and various affidavits and other data obtained from Finland. These present a clear and uncontroverted picture of the facts and circumstances surrounding the instant importation.

It appears therefrom that the said Murray Boro, and a Mr. Louis Schroeder, whom he described as a competitor of his, and also a friend, visited Finland in November 1945 for the purpose of purchasing paper suitable for the manufacture of corrugated containers, there

being a shortage of that material in this country. They there contacted Mr. Juuso W. Walden, the managing director of United Paper Mills, Ltd., which concern manufactured various types of paper. They described the paper which they required and explained that because of governmental shipping regulations in the United States, the containers manufactured by them must meet certain rigid tests. The specifications of the paper they desired to purchase were that it be of pure Kraft quality, meet a Mullen test of 90 to 100 pounds per square inch, have a caliper of 0.014 (thickness in inches), a dry finish (M/F), and a substance of 109.5 pounds per 480 sheets, 24 by 36 inches.

Mr. Walden advised them that Kraft paper meeting those specifications was not then being manufactured in Finland, but that if a sale could be negotiated through the Finnish Paper Mills Association of Helsinki, the sole selling office for all the paper mills in Finland, his company would manufacture such paper.

Thereafter, two contracts were consummated through Holger Nysten, the general manager of the Finnish Paper Mills Association, one for the Ideal Container Corp., of New York City, and the other with Corrugated Container Corp. of Brooklyn, N. Y., Mr. Schroeder's concern. Each contract provided for the sale of 250 tons of the paper at a price of $95 per ton, delivered at New York, duty paid.

No exclusive agreement was entered into with either Ideal Container Corp. or Corrugated Container Corp. for the sale of this merchandise. Both the association and United Paper Mills, Ltd., were willing to sell the same paper at the same price to anyone for export to the United States, but apparently no other companies or individuals interested in this type of paper were in Finland during the years 1945, 1946, and 1947, and no other sales or offers for sale were made for export to the United States.

It further appears that during the years 1945, 1946, and 1947, Kraft paper used in the manufacture of corrugated board was produced in Finland for domestic consumption. It was sold at a price of 13.10 Finnish marks per kilo, less 1 per centum discount. The Finnish business turnover (or sales) tax was not imposed on any of these sales because of the exemption in the law of material used in the manufacture of products which are subject to taxation. Nor did said tax extend to or cover any sales for export. While the paper sold for home consumption was used for the same purpose and was generally of the same type as the exported merchandise, it did not meet all of the specifications demanded by the American purchasers. The differences between the two types of paper are described in the affidavit of Juuso W. Walden, (plaintiff's exhibit 3) to be as follows:

\* \* \* The paper delivered to these American purchasers was of dry-finished (M/F) quality, whereas the quality of deliveries for home consumption

in Finland was machine-glazed (M/G); the Americans demanded a caliper of .014 (thickness in inches) and a Mullen test of 90–100 pounds per square inch; for paper delivered to Finland such reservations were not made. The paper delivered to the Americans was of a substance of 109.5 pounds per 480 sheets, 24″ x 36″, whereas the substance of the paper delivered for home consumption in Finland was 130 pounds per 480 sheets, 24″ x 36″.

As explained by the witness, Boro, the specifications in the United States call for a finished container with a bursting strength of 200 pounds. In order to comply therewith, it is necessary to use two basic sheets of a bursting strength of 90 to 100 pounds each, which, together with the corrugated materials, bring the container to a bursting strength of over 200 pounds per square inch. Moreover, a weight of 130 pounds per 480 sheets, such as is used in Finland, would have been too heavy for use here.

Boro and Schroeder, on subsequent visits to Finland, arranged for the purchase of additional paper for their respective firms. The second pair of contracts, negotiated prior to the shipments under the first order, called for the delivery of 1,000 tons to each, at the same price and terms, although, due to the lifting of OPA control in this country, some of the later shipments thereunder were at a price of $105 per short ton, c. i. f., New York, duty to be paid by the buyers. Shipments under a third set of contracts for 1,500 tons each were first made at $6.50 per cwt. and later increased to $7.50 per cwt. In both these latter instances the transactions were c. i. f., New York, duty to be paid by the buyer.

Counsel for plaintiff having conceded that foreign value, if it exists, would be higher than export value, the first question which arises is whether there was, in fact, a foreign value for this merchandise. In view of the provisions of section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, which are recited below,[1] the answer to that question depends largely upon a consideration of whether such or similar merchandise was freely offered for sale to all purchasers in the principal markets of the country of exportation. The evidence conclusively establishes that such or identical merchandise was not so offered. There is undisputed testimony that no paper meeting the specifications required by the American purchasers was produced in Finland until ordered by the ultimate consignee herein and its competitor. Such paper was not sold for domestic consumption.

---

[1] SEC. 402. VALUE.

   *       *       *       *       *       *       *

  (c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

On the issue of the similarity of the domestic product with the exported one, the testimony points out certain factual differences between the two which make the Finnish paper unsuitable for the American market. The former is a heavier paper; it is machine-glazed rather than dry-finished; it is not required to meet a Mullen test of between 90 to 100 pounds per square inch, nor is there any requirement of thickness of individual sheets.

Counsel for the plaintiff rely upon these differences to support their contention that the domestic product is so dissimilar that it is not interchangeable with the paper manufactured for export and, hence, that it is not similar merchandise within the meaning or intent of section 402 (c) of the Tariff Act of 1930, *supra.*

Whether two articles of merchandise possess that degree of likeness that they may be deemed similar articles within the meaning and intent of section 402 of the Tariff Act of 1930 must in the final analysis depend upon the facts of record in each individual case. But there are certain general guiding principles which define and limit the conclusions to be reached in each instance, for the meaning of the word "similar" in the involved provision has found frequent expression in customs litigation.

In the case of *United States* v. *Irving Massin & Bros.,* 16 Ct. Cust. Appls. 19, T. D. 42714, our appellate court stated:

In view of the common meaning of the word "similar" and of the authorities cited, we are of opinion, and so hold, that if goods are made of approximately the same materials, are commercially interchangeable, are adapted to substantially the same uses, and are so used, ordinarily, they are similar, within the meaning of section 402 (b). The importer or foreign manufacturer may not, by making a few changes in structure, or in giving the product a new name, or by restricting its sale to the American purchaser only, *ipso facto* remove his merchandise from section 402 (b), the foreign value provision.

In the cases of *United States* v. *F. Vietor & Achelis,* 17 C. C. P. A. (Customs) 412, T. D. 43864, and *United States* v. *Thomas & Co.,* 21 C. C. P. A. (Customs) 254, T. D. 46788, the relative values of the two compared products were considered to be significant factors in determining their similarity for appraisement purposes. In the former case, a disparity in value of at least 20 per centum constituted one of the elements upon which the court based its finding of dissimilarity. The court there stated (p. 416):

\* \* \* It further appears from the record that quality No. 9 ribbon, due to the difference in construction, is worth at least 20 per centum more than the imported ribbon, quality No. 90. There is some evidence to the effect that the difference in value is even greater than 20 per centum. No doubt the two qualities have similar uses, but it does not necessarily follow that they are "similar" for appraisement purposes. \* \* \*

On the other hand, the decision in the *Thomas* case, *supra,* hinged largely upon the finding of "equality in value and similarity in cost of production."

It is true that the record herein establishes that the ultimate use of the material produced for consumption in Finland was the same as that of the imported merchandise, in that both types of test or container board were used in the manufacture of corrugated containers. But is seems to me that a similarity in ultimate use does not really obtain if a buyer cannot accept one article, for the purpose for which he intends the other, in instances where his refusal to do so is predicated upon some governmental regulation or restriction, the peculiar demands of the market which he supplies, or the process of manufacture to which the article must subsequently be subjected. *Luigi Vitelli Elvea, Inc., et al.* v. *United States*, 9 Cust. Ct 466, Reap. Dec. 5661, affirmed in *United States* v. *Luigi Vitelli Elvea, Inc., et al.*, 11 Cust. Ct. 437, Reap. Dec. 5941; *Marine Products Co.* v. *United States*, 22 Cust. Ct. 371, Reap. Dec. 7647, modified in other respects in *United States* v. *Marine Products Co.*, 24 Cust. Ct. 615, Reap. Dec. 7830 (appeal pending); *R. Gaertner & Co., Inc., et al.* v. *United States*, 7 Cust. Ct. 511, Reap. Dec. 5445, modified in other respects in *United States* v. *R. Gaertner & Co., Inc., et al.*, 9 Cust. Ct. 609, Reap. Dec. 5727.

There is evidence in this case, which is not controverted, that as the result of governmental shipping regulations in the United States, Kraft paper, used in the manufacture of corrugated containers, must be of certain definite specifications, and meet certain rigid tests. It is not disputed that the paper sold in Finland for domestic conversion into corrugated containers lacked these specifications and was not required to meet those tests.

In the case of *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, it was stated:

* * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

Here, the prospective purchasers legitimately rejected the alternate article because it could not be used as a substitute for the material they were seeking. It matters not that the merchandise they were seeking might have served as a substitute in Finland for the manufacture of corrugated containers (and the record is silent on that point), so long as the converse of that proposition, to wit, that it was not suitable for the American market, was clearly established. *Marine Products Co.* v. *United States, supra*.

Moreover, it would appear that there exists a substantial difference in value between the Finnish home product and the instant merchandise. An examination of the official papers reveals that the appraisement at 13.10 Finnish marks per kilo less 1 per centum, plus 11.1 per centum, packed, represents an advance of 46 per centum over the entered value. Even without the disputed item of the Finnish sales tax, the propriety of the assessment of which, in view of the conclusions here reached, it is not necessary to determine, the value of the Kraft paper sold for home consumption in Finland was considerably greater than the price paid by the importer for the merchandise at bar. The percentage difference between the two far exceeds that which the court in the *Vietor & Achelis* case, *supra*, considered to be material to its holding that the articles which it was called upon to compare were dissimilar.

In view of the foregoing considerations, I hold that the merchandise sold in Finland for domestic consumption is not similar to that herein involved, and therefore no foreign value such as is defined in section 402 (c), *supra*, exists for this merchandise.

Insofar as export value is concerned, I am of opinion that the evidence adduced herein is insufficient to establish the same. In order to comply with the provisions of section 402 (d) of the Tariff Act of 1930,[2] which defines export value, it must be shown that such or similar merchandise was freely offered for sale to all purchasers in the usual wholesale quantities and in the ordinary course of trade. The record before me does not contain any proof that merchandise such as or similar to that here involved was ever sold or even offered for sale to any purchaser other than the instant importer and his competitor. As to those particular sales, although much stress is placed upon the fact that the two American concerns which ordered the instant merchandise were independent competing firms, the circumstances surrounding their respective purchases are more consistent with the conclusion that they were sales privately negotiated, than that they were the result of a free offer to all purchasers in the principal market of the country of exportation.

While it is well established that a single sale may, as a matter of law, suffice to support an export value, *United States* v. *Malhame & Co.*, 19 C. C. P. A. (Customs) 164, T. D. 45276, it must also appear "that such a sale accords with a free offering at that price." The record in this case clearly negatives such a finding.

---

[2] SEC. 402. VALUE.

\*      \*      \*      \*      \*      \*      \*

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The affidavit of the general manager of the Finnish Paper Mills Association, plaintiff's exhibit 2, frankly reveals that no other sales or offers for sale of the instant merchandise were made during the period which is pertinent hereto. The mere statement that "the Association was willing to sell the same paper at the same price to anyone for export to the United States" falls short of establishing the statutory requirement that such or similar merchandise must have been freely offered for sale to all purchasers at or about the date of exportation. *United States* v. *Oceanic Trading Co.*, Reap. Circ. 3233; *Golding Bros. Co., Inc.* v. *United States*, 6 Cust. Ct. 877, Reap. Dec. 5196; *Transatlantic Shipping Co., Inc. (Absorbo Beer Pad Co., Inc.)* v. *United States*, 28 C. C. P. A. (Customs) 19, C. A. D. 118.

Accordingly, I am constrained to hold that there is no export value for such or similar merchandise. Moreover, as the appraiser erred in finding foreign value, I direct that the within appeal be restored to the docket for the purpose of affording the plaintiff an opportunity to prove United States value or cost of production of said merchandise, as the case may be.