MARINE PRODUCTS CO. *v.* UNITED STATES

**No. 7647.**—Pro forma invoices dated May 7, 1942, etc.
Entered at San Diego, Calif., May 7, 1942, etc.
Entry Nos. 68; 3.

(Decided on rehearing [Reap. Dec. 7373] January 19, 1949)

*Harper & Harper* (*Lawrence A. Harper* and *George R. Tuttle* of counsel), *Benjamin Shipman*, associate counsel, for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Samuel D. Spector* and *William J. Vitale*, special attorneys), for the defendant.

CLINE, Judge: This is a rehearing of certain reappraisement appeals which involve the value of canned tuna fish shipped from

Mexico on April 26 and July 8, 1942, packed in cases containing 48 cans, and invoiced, entered, and appraised as follows:

| | Invoiced and entered U. S. $ per case | Appraised Mex. pesos per case |
|---|---|---|
| Yellowfin | 3. 817 | 48. 50 |
| Striped | 3. 645 | 48. 50 |
| Yellowfin or striped flakes | 3. 511 | 41. 50 |
| | Plus American cases and cans | Net packed, U. S. cans and cases included |

The merchandise was entered on the basis of cost of production and was appraised on the basis of foreign value.

The case was originally heard at San Diego, Calif., on October 6, 1944. Thereafter, a decision was rendered by Chief Judge (then Presiding Judge) Oliver sustaining the values found by the appraiser, *Marine Products Co.* v. *United States,* 19 Cust. Ct. 243, Reap. Dec. 7373. As to reappraisement No. 151858–A, it was held that no foreign value existed since there were no sales or offers for sale for home consumption on or about the date of exportation of that shipment, and that there was no export value since the exporter's entire output was sold to the importer herein. The court found, however, that the plaintiff had failed to show that there was no United States value of similar tuna fish, stating:

\* \* \* Having proved that the sales in the United States of this Mexican tuna fish were confined to one purchaser, and that *identical* merchandise was not freely offered to all purchasers, establish only that no United States value was created by the sales or offers for sale of *such* merchandise. This record is silent as to whether or not any *similar imported* tuna fish is offered for sale in the United States within the definition of United States value. [Italics quoted.]

The values found by the appraiser were therefore sustained.

As to reappraisement No. 151859–A, the court found that a foreign value did exist and that such value was represented by the value found by the appraiser. The court said:

It would seem that, even if it were agreed that the so-called Mexican pack and the American pack were not similar for customs purposes, this record does not establish that all of the merchandise involved in the sales reported by the customs agent in exhibit B was of the Mexican pack. It would seem from this record that all, excepting possibly the one sale made to Pando on August 12, 1942, at his contract price, was either of American-pack tuna fish or merchandise similar thereto for customs purposes.

Thereafter, a motion was made by the plaintiff for a rehearing on the ground that the burden is not upon the importer to show lack of sales of merchandise other than Mexican tuna fish; that when foreign value was shown not to exist, the burden of proceeding to prove United States value was on the Government; that if the court concluded that the burden of proceeding was upon the importer, that

constituted a new construction of the statute. The motion for a rehearing was granted.

At the original hearing Lucian K. Small testified that he was the president of Marine Products Co., which company was engaged in the importation and distribution of canned seafood products imported from Mexico; that he was familiar with the conditions surrounding the production and sale of canned tuna fish in Mexico and the United States; that from 1935 to 1938 his company virtually operated on a cost-plus basis the tuna fish cannery at Cape San Lucas, Mexico; that as to the importations before the court, he had made a contract with Compañía de Productos Marinos, a Mexican company, to purchase their entire output for the season; that in 1942 there was only one tuna-packing plant operating in Mexico, the one at Cape San Lucas; that he knew of no other importers of Mexican tuna into the United States in 1942; that he had a verbal agreement with Westgate Sea Products Co. to sell it whatever tuna he purchased in Mexico in 1942. He explained that there are three grades of tuna sold to the United States, the fancy solid pack, the standard, and the flakes, and two grades sold in Mexico, the standard and the flakes; that the tuna fish sold to the United States had to meet the standards of the Food and Drug Administration; that the same standards are not required in Mexico and tuna can be used for the Mexican market which could not be used for export to the American market; that for the Mexican market they use what is called "green bellies" which are fish that have rotted, and fish which are honeycombed from being held too long on ice, and fish which have been shipped for the American market but have been rejected by the Food and Drug Administration; that they have standards here as to how dark-colored the fish may be; that very often small animals or insects get into the Mexican pack and it is not objected to seriously by the Mexicans but would be condemned by the Food and Drug Administration; that in his opinion, from practical experience in the trade and experience with both packs, the Mexican pack and the American pack are not commercially interchangeable in the wholesale trade and commerce in the United States. He stated further that there is a terrific sales resistance to this merchandise because it is a product of Mexico; that it was overcome by importing it unlabeled and selling it to an American buyer who had a well-known, highly advertised label.

On cross-examination the witness testified that the merchandise was sold to Westgate because it paid more for it; that it was not offered to anybody else; that the solid pack yellowfin tuna was sold at $13 per case, the striped at $11, and the flakes at $10. He stated that he was familiar with the Mexican brands "Calmex" and "Promar"; that they were canned in the same cannery as the American pack;

that as a general practice they were not canned from the same fish; that there might have been some cases that were as good as the American pack, but the pack as a whole was not; that the can for the American market had to come up to a specified standard and the can for the Mexican market did not; that if the Mexican cans were sold at a higher price than those imported into the United States, it was because he had a contract to buy the American pack at a specific price and the market went up very rapidly in Mexico.

The witness further testified that 80 cases of imported merchandise were rejected by the Food and Drug Administration; that they were re-exported to Mexico and sold there at the regular price.

The contract between Marine Products Co. and Compañía de Productos Marinos (exhibit 1) provides that the former shall buy and the latter shall sell all of the tuna packed by it at its plant during the season commencing February 1 and ending June 30, 1942, at the following net prices f. o. b. dock San Diego, freight, insurance, and importation duties paid: Fancy solid pack yellowfin or skipjack tuna at $6.70 per case; standard yellowfin or skipjack tuna at $6.45 per case; and flakes at $6.25 per case; that all tuna is to be of first class quality and condition and passed by the United States Department of Agriculture Food and Drug Administration.

Edward W. Chapman, Jr., called as a witness for the plaintiff, testified that he is the vice president and sales manager of Westgate Sea Products Co.; that that company deals in canned fish, including tuna; that he has been engaged in that activity 17 years; that he is familiar with both the tuna packed for the Mexican trade and that packed for the American trade; that the Mexican pack is not commercially comparable with the American pack; that his company had an oral contract with Marine Products Co. to take the whole pack imported by the latter in 1942; that his company put its labels on it and sold it; that it was sold very quickly, within a week at the maximum; that his company's label made it possible to sell the tuna at a premium because it is a highly advertised label; that with some other label, it would have brought a lower price, and with a Mexican label, it would have sold at a loss.

The affidavit of R. J. Cabrál (exhibit 2) states that he has been the general manager of Cía de Productos Marinos, S. de R. L. for 3 years; that that was the only tuna plant operating in Mexico during 1942; that the plant put up two separate packs of tuna during 1942, one for the Mexican market and one for the American market; that the American pack was in three grades: (1) Fancy solid pack yellowfin consisting as nearly as possible of one solid chunk of tuna; (2) standard, consisting of yellowfin or skipjack tuna containing two or more solid pieces with flakes to fill in; (3) yellowfin or skipjack flakes consisting of small broken pieces; that the Mexican pack normally

consisted of skipjack tuna and was put up in two grades, standard and flakes. The affidavit also states:

* * * When an American pack was being prepared no Mexican pack was intentionally put up although sometimes tuna which did not prove to meet American standards would find its way into the Mexican market (see below). When a Mexican pack was being prepared no American pack was put up. As more fully set forth below, the tuna packs were graded differently, met different standards, were sold separately and were not commercially interchangeable.

* * * * * * *

In the packing of such tuna for the American market great care was taken to comply with the American Pure Food and Drug Administration standards. In so far as possible all insects were kept out of the cans. Only the fish in the freshest condition was used and instructions were given that in the case of any doubt the fish should not be included in the American pack.

* * * In preparing the Mexican pack in 1942 skipjack and yellowfin were used interchangeably. The American trade is particular about the whiteness and solidity of the fish, consequently fish which although perfectly edible had become somewhat darker in color and softer in texture while being kept on ice, could not be used for the American pack, but was entirely acceptable to the Mexican trade. Moreover the American Pure Food and Drug authorities were extremely fastidious on these and all other matters, and if doubts should arise as to the acceptability of certain fish, tuna which might have been put in a can bearing an American embossing in English would be given a Mexican label and sold in the Mexican market.

The tuna sold in the Mexican market was not commercially comparable with the tuna exported to the United States. It was not packed to meet the American Pure Food and Drug standards. In fact 80 cases of tuna which had been intended for the United States and were rejected by the American Pure Food and Drug authorities were returned to Mexico and sold in the Mexican market, after Mexican labels had been attached.

At the rehearing, plaintiff called R. O. Leeber who testified that in 1942 he was captain of a tuna-fishing vessel, the "Vigilante"; that the fish he caught off his boat consisted of skipjack, black skipjack, yellowfin, and bonito; that canneries buy as tuna, the skipjack, the yellowfin, the bluefin, and the albacore; that the black skipjack and the bonito were different fish, not bought as tuna. Captain Leeber stated further that as the fish were caught they were left on deck or run into the hold; that they were not packed in ice; that as the boat was then from 12 to 14 hours from the cannery, the fish were in very poor condition when they arrived; that as the climate is warm, the fish should have been packed in ice within 3 or 4 hours after they were caught, but that the cannery was not able to supply sufficient ice for that; that on arrival the fish were soft, not firm, and were burned, that is, partially cooked, due to the warm weather and the heat of the engine room walls; that such fish would start to decompose; that little holes would show up through the fish; and that such fish are called honeycomb fish.

Captain Leeber stated that he brought approximately 130 to 135 tons of fish to the cannery during 1942; that between 13 and 15 tons

were rejected; that he was informed by the cannery that the fish were in very bad condition and would be used only for the Mexican pack; that the rejection of certain fish was due to their condition, not to the kind of fish.

Victor Manuel Chiapa testified that he had been superintendent of a cannery at Cape San Lucas in 1941 and 1942; that when packing for exportation to the Marine Products Co. they canned yellowfin tuna and skipjack; that for the Mexican market they canned yellowfin, skipjack, black skipjack and bonito; that the pack for the United States consisted of a yellowfin fancy pack containing big chunks only and the best of the meat, the yellowfin standard consisting of the head part and chunks and a certain percentage of flakes, not higher than 14 per centum, and some packs consisting of flakes alone; that for the Mexican market they canned the yellowfin fancy pack only a few times; that in the standard pack for the Mexican market the amount of flakes was larger, amounting to as high as 30 per centum; that flakes were also packed for the Mexican market.

The witness also testified that Captain Leeber's was not the only boat which brought fish to the cannery; that they had another boat, the "Magnolia"; that the "Magnolia" carried ice and also had an ice machine; that the fish brought in by the "Vigilante" were packed for the Mexican market; that that included black skipjack and bonito; that the cans used for the Mexican pack were embossed on the top "Producto Nacional"; that the marking on the cans used for the American pack was "Product of Lower California, Tuna in Oil"; that sometimes the lids marked "Product of Lower California" were also used for the Mexican pack; that a label was always applied to the Mexican cans, but never to the American ones; that in canning for the United States, they always picked the best and the fresher fish, but for the Mexican pack they used fish that were not so firm, sometimes a little sunburned, and sometimes just about starting to honeycomb; that they used portions of the fish in the Mexican pack not used in the American, such as the parts of meat behind the gills, parts of the tail, and the bellies; that that pack was not strictly first class "because we could pass that pack even with small spots of dark meat and blood for the Mexican market."

On cross-examination Mr. Chiapa stated that they did not put any decomposed meat in the Mexican pack, but it was not as good quality; that honeycombed fish can be canned for the Mexican market; that the American pack and the Mexican pack were different in appearance and that softer meat was used for the Mexican pack, but that it was just as wholesome.

W. Wade Ambrose, president and general manager of Westgate Sea Products Co., testified that the packing and sale of tuna fish was subject to control by the Food and Drug Administration and the

Federal Trade Commission; that the former checks to see if the pack is fit for human consumption and the latter promulgates trade practice rules; that the fish that may be packed commercially as tuna in this country are the albacore, the yellowfin, the skipjack or striped tuna, and the bluefin; that the black skipjack and the bonito are not used or sold as tuna in this country; that a can of standard yellowfin consisting of chunks and about 14 per centum flakes would not be accepted as a good delivery for fancy solid yellowfin; that a can containing 30 per centum flakes would not be acceptable as good delivery for the standard can; that following the Federal Trade Commission's trade practice, the standard which he sold consisted of yellowfin or striped tuna in solid chunks up to 75 per centum and about 25 per centum small pieces or flakes; that cans containing as much as 30 per centum flakes would not be good delivery for the standard under Federal Trade Commission practices, nor would cans containing pieces of skin, bones, or clots of blood be accepted as good delivery for an order of flakes; that the portion of tuna sold to him for Mexico in 1942 as fancy yellowfin met the requirements of a fancy pack as he knew them; that the portion sold as standard met the requirements of a standard pack; that the portion sold as flakes met the requirements for flakes.

Mr. Lucian K. Small, recalled as a witness, stated that his company imported 4,926 cases of canned tuna from Mexico during 1942; that it was purchased from the cannery at Cape San Lucas known as Compañía Productos de Marinos; that it was sold to the Westgate Sea Products Co.; that there was no other Mexican tuna on the market in San Diego during 1942; that he did not recollect receiving any striped solid pack tuna; that of the solid pack they received yellowfin tuna; that the packs enumerated in exhibit B, namely, yellowfin solid, yellowfin flakes, striped solid, and striped flakes, did not constitute all of the types which he purchased under his contract; that he also imported striped or skipjack standard type; that the striped tuna standard pack was marked "SC"; that his company paid the duty on the 4,926 cases, but was reimbursed by the canner for any duty over $1.50.

Defendant introduced into evidence as exhibit A, a report of Treasury Representative D. J. De Lagrave, dated March 27, 1943.. This contains a· summary of information obtained from Roméo Jimenez Cabrál, general manager of the Compañía de Productos Marinos, verified by an examination of the company's books relative to the cost of production.

Exhibit B is a report of customs agent Benjamin S. White, Jr., dated November 30, 1942. It states that the Compañía de Productos Marinos had entered into a contract with the Marine Products Co. for the sale of its entire output; that it also had a signed agreement

with E. Pando y Cía, Mexico, to deliver 15,000 cases of "Calmex" solid pack tuna and 1,800 cases of "Promar" tuna fish flakes; that sales to the United States were restricted to the Marine Products Co.; that regular wholesale sales were made in Mexico; that an examination of the sales records revealed continuous sales since June 15, 1942; that no difference was made in price on account of the quantity purchased; that Mr. Cabrál stated that his company endeavored to sell only a small percentage of its products in Lower California and that he tried to restrict the quantity of the sales; that "Calmex" was sold at 48.50 pesos per case and "Promar" at 41.50 pesos per case. The report contains a list of all sales made by the company in Mexico since June 15, 1942.

The first question to be determined is whether or not a foreign value existed for these importations. The first shipment herein (reappraisement No. 151858–A) was made on April 26, 1942, and the report of the customs agent (exhibit B) indicates that there were no sales in Mexico prior to June 15, 1942. Therefore, no foreign value can be found for this shipment.

Moreover, it appears that the merchandise shipped to the United States was not commercially interchangeable with that sold in Mexico. The record indicates that the American pack was more carefully processed in order to meet the requirements of the Food and Drug Administration; that firm, fresh fish were used in the American pack, while softer fish and some that were honeycombed were used in the Mexican; that only two varieties of tuna were used in the American pack, the yellowfin and the skipjack, while the Mexican also contained the black skipjack and the bonito; that these two latter are not recognized as tuna in the United States; that parts of the fish which could not be used in the cans to be exported were used in the cans sold domestically, such as, parts of meat from behind the gills, parts of the tail, and the bellies; that tuna becomes darker when it is held on ice too long or the temperature is too high; that fish which was still edible but which had become darker in color was not used in the American pack, but was used in the Mexican.

These dissimilarities are significant. In *Gorton Pew Fisheries Co., Ltd.* v. *United States*, 14 Cust. Ct. 155, C. D. 928, it was held that bonito, a member of the same genus of fish (the mackerel family) as tuna, was not classifiable for tariff purposes under the provision for tuna fish. The court said (p. 159):

For all practical purposes, bonito is a definite and distinct commercial commodity. The trade accepts it as such. Food and drug authorities insist upon its recognition, separate and apart from all other commercial fish products. Its likeness of taste and identical use—as food in salads and sandwiches—with tuna, are elements of similarity that exist among several varieties of wholly unrelated kinds of fish. Nor is it material that bonito is displayed in retail stores on a counter that includes "Tuna Fish, Sardines, Canned Crab." The important

condition is that bonito is commercially regarded as a specific kind of fish and so packed. True, it may be taken instead of tuña when the latter is not available or possibly because of the price differential. But bonito is not tuna. *Meyer & Lange* v. *United States*, 6 Ct. Cust. Appls. 181, T. D. 35436, supports this conclusion.

Therefore, canned bonito or canned bonito and tuna, combined, are not the same as canned tuna and are not commercially interchangeable.

Note also the following fair practice rules laid down by the Federal Trade Commission (Code of Federal Regulations, title 16, Sec. 146.1, 3 Cum. Supp. p. 4223):

§ 146.1 *Definitions.* For the purpose of the rules in this part and in their application the following definitions respecting canned tuna and canned tuna products shall apply:

(a) *Fancy tuna.* (1) The term "Fancy Tuna" as herein used shall be deemed to be the descriptive term for choice cuts of cooked tuna, from fish weighing not more than 60 pounds round weight, packed in cans with large pieces of solid meat and with one or two small pieces of solid meat added, if necessary, to bring the contents up to required net weight, but not including any flakes added at the time of packing.

(2) The term "Fancy White Meat Tuna" as herein used shall be deemed to be the descriptive term for like choice cuts of albacore packed in the same manner.

(3) The expression "Choice Cuts" means large choice pieces of cooked tuna composed of tender solid meat of selected light color and fine texture, and free from dark meat, bones, skin, extraneous tissue, and any substance or condition impairing quality.

The rules further provide that standard tuna shall contain at least 75 per centum large pieces of solid meat and be free from dark meat, bones, skin, extraneous tissue, and debris, and that tuna flakes shall contain small pieces of wholesome cooked tuna meat from the whole tuna or from parts of tuna not utilized in the packing of fancy or standard grades but free from dark meat, bones, skin, extraneous tissue, and debris.

The Mexican pack, as described by the witnesses in the instant case, would not have come up to the standards set up by the Federal Trade Commission and therefore could not have been commercially interchangeable with the American pack.

A somewhat similar situation was involved in *United States* v. *Luigi Vitelli Elvea, Inc., et al.*, 11 Cust. Ct. 437, Reap. Dec. 5941, in regard to canned tomatoes. It was shown that there existed regulations of the U. S. Department of Agriculture with respect to the manufacture of tomato products, limiting bacterial count, spores, and mold to certain percentages, and also limiting the number of square inches of peel which would be allowed in canned peeled tomatoes. It was further shown that in order to comply with the standards, only perfect, ripe tomatoes, with unbroken skin, might be used. There was evidence that no such restrictions were in effect in Italy; that the Italian consumer preferred the taste or flavor of such products when not packed

under such restrictions; and that it was the practice among producers in Italy to select only first quality, firm, ripe, sound tomatoes to be used in the manufacture of tomato products for exportation to the United States, while the run of the crop, including the green, light-colored, sunburned, cracked, split, or unripe tomatoes, would be used in the manufacture of products for home consumption. The court held that while the materials and method of manufacture of the home consumption pack and the export pack did not seem to be too widely separated, the decisive factor was the element of availability for substitution; that while the export pack might have been substituted for the home consumption pack, the reverse was not true, because of the fact that the home consumption pack would not meet the American Government standards. It was held that no foreign value existed.

In the instant case the tuna fish for export were selected and prepared to meet the requirements of the Food and Drug Administration and the Federal Trade Commission while no such requirements applied in Mexico; therefore, while the American pack might have been sold in Mexico, the Mexican pack could not have been sold in the United States.

In *United States* v. *Kraft Phenix Cheese Corp.*, 26 C. C. P. A. 224, C. A. D. 21, two varieties of Roquefort cheese, "Standard" and "Portion," were held to be dissimilar since there was a difference in the method of preparation and in the finished product in that the "Portion" cheese had a firmer texture and less mold and was capable of being cut with little or no crumbling.

In that case the materials were the same, but the method of preparation was different. In the instant case the materials themselves differed, in that only certain types of fish, yellowfin and skipjack, and only certain portions of that fish, were used in the American pack.

For these reasons I find that the merchandise sold in Mexico was not similar to that sold for export within the meaning of section 402 (c) of the Tariff Act of 1930. Therefore, no foreign value exists.

It further appears that there was no export value for this merchandise since the exporter had contracted to sell its entire output to the plaintiff and no sales or offers to sell for exportation to the United States were made to others, and the exporter operated the only tuna-fish-packing plant in Mexico at the time.

The next question is whether the evidence is sufficient to show that no United States value existed. The importer contracted to sell and did sell all of the tuna fish it received during 1942 to Westgate Sea Products Co. Therefore, the sales made in the United States by the importer can form no basis for the determination of United States value.

The original decision in this case by Judge Oliver held that the importer had failed to disprove the application of United States value on the ground that although it had been shown that the sales of this Mexican tuna fish were confined to one purchaser, the record was silent as to whether or not any similar imported tuna fish were offered for sale in the United States.

In order to find a United States value for a given importation, it is necessary to show the price at which such or similar previously imported merchandise is being freely offered for sale to all purchasers at or prior to the date of exportation of the imported merchandise. *United States* v. *New York Merchandise Co., Inc.*, 31 C. C. P. A. 213, C. A. D. 274. There must be prototype merchandise in the United States available for offer at or near the date of exportation. *United States* v. *G. W. Sheldon & Co.*, 23 C. C. P. A. 245, T. D. 48108; *United States* v. *Collin & Gissel*, 29 C. C. P. A. 96, C. A. D. 176.

In the instant case the record discloses that the only Mexican tuna fish sold in the United States during 1942 was the 4,926 cases imported by Marine Products Co. The first shipment was exported from Mexico on April 26, 1942. There was no other Mexican tuna fish on the market at that time; therefore, no United States value can be found for this shipment. The record indicates that this shipment was picked up by Westgate Sea Products Co. as soon as it was released by the Food and Drug Administration and was disposed of by that company within a week. Therefore, none of it was available for offer at the time the second shipment was exported on July 8, 1942. Thus no United States value can be found for that shipment.

It is further contended by the plaintiff that this merchandise in its imported condition could have had no United States value, because it was imported unlabeled and could not be sold in that condition. Mr. Chapman testified that his label made it possible to sell the merchandise at a premium because it is highly advertised and has consumer demand; that if he had used some other label he would have gotten a lower price; and that if he had used a Mexican label, he would have had to sell at a loss. He stated on cross-examination that even with the same merchandise in the can he would get more for it with his label on it.

In *John G. Kline* v. *United States*, Reap. Circ. 2205, it was held that the market price of one brand of cheese could not be used to find the value of another brand. The court said (p. 2070):

We think the weight of the oral testimony establishes that this cheese is known by a brand; that, in fact, all cheese has a value by reason of its brand; that comparison of the Rigi with other cheese depends upon its popularity; that two cheeses may have similar ingredients, and yet one for some reason may be more popular with the public, and thereby create a higher price. It therefore becomes necessary to determine what the brand in question is selling for in the market in order to ascertain its market value.

The court quoted from a special agent's report referring to a conversation in which the shipper stated that the price did not depend so much on the quality as on the commercial esteem of the brand and that it would be unfair to appraise his brand on the basis of the value of a brand which brought a higher price on account of its reputation, which was the result of extensive advertising campaigns. The court then stated:

This statement is unquestionably borne out by the experience of business institutions dealing in merchandise of any character. Now frequently is this true as to brands of fish and herring. The brand really establishes the market value rather than the quality.

The testimony in the instant case indicates that the market value of the merchandise in the United States is established by the brand name rather than the quality. Since it did not bear this brand name when imported, dutiable value cannot be predicated upon the selling price of the merchandise after the label has been attached. Dutiable value is found upon merchandise in its condition as imported. *American Sugar Refining Co.* v. *United States*, 181 U. S. 610; *United States* v. *Fritzsche Bros., Inc.*, 35 C. C. P. A. 60, C. A. D. 371.

The original decision of the learned judge holding that the plaintiff had failed to negative the existence of United States value is predicated on the theory that although there was no United States value for Mexican tuna fish the record did not establish whether or not any similar imported tuna fish was offered for sale in the United States at the date of exportation of this merchandise. That raises the question as to whether tuna fish imported from other countries can be considered to be similar within the definition of United States value.

The provision for United States value first appeared in the Tariff Act of 1922. It was the intent of Congress in enacting that provision that the United States value should represent a constructive foreign value. *United States* v. *Carbic Color & Chemical Co.*, 47 Treas. Dec. 526, T. D. 40859; *Dodge & Olcott Co.* v. *United States*, 48 Treas. Dec. 78, T. D. 41049; *United States* v. *Wetterwald*, 57 Treas. Dec. 455, T. D. 43927; *United States* v. *New York Merchandise Co., Inc., supra.*

In *Dodge & Olcott Co.* v. *United States, supra*, the court, in discussing paragraph 28 of the Tariff Act of 1922 which provided for an ad valorem duty based upon the American selling price, stated (p. 79):

The reason such a controversy over the classification of an article is attempted to be made upon an appeal to reappraisement (valuation) is because paragraph 28 carries with it a novel plan of measuring duty never before known in our tariff history. All previous ad valorem tariffs have based tariff valuations upon the value of the taxed imported article, while paragraphs 27 and 28 base customs

valuation upon the value of another untaxed article produced in another country, to wit, the United States.

\* \* \* \* \* \* \*

It should be kept clearly in mind that finding export value (now to be controlling if higher than other sales in the home market) calculating from cost of production, or calculating back from the United States selling price of the imported article, are all simply methods for finding, either directly or by construction, the foreign market value of the imported article itself \* \* \*.

In *United States* v. *New York Merchandise Co., Inc., supra*, the Court of Customs and Patent Appeals stated (p. 218):

In considering the importance of arriving at the right conclusion in the instant case on the decision of this important and sharply controverted question, we think it not improper to say, and it has been elsewhere often said, that in arriving at United States value or the cost of production under the act of 1930 of [sic] other acts similar in character, we must take into consideration the fact that Congress was trying, by including certain items and excluding others, to arrive at what might be comparable to a foreign value or an export value if there had been one, and that Congress sought to apply as a settled tariff policy the foreign or export value whenever it was applicable, in preference to the United States value, which was obviously a less satisfactory basis for arriving at the final appraised value. \* \* \*

The use of a product of any other country than Mexico in the instant case to appraise canned tuna fish from Mexico would not result in the finding of a constructive foreign or export value, since foreign and export values are based upon the selling price of the article in the country of exportation and not upon the selling price of some other article in another country.

In *Barr* v. *United States*, 342 U. S. 83, it was held that the "free" rate rather than the "official" rate of conversion of currency should have been used; that the assessment of an ad valorem tax on imports involves an ascertainment of the true value of the article as of the date of the tax; that in that case the merchandise was purchased at the lower "free" rate and that if the higher "official" rate were used in the valuation of the articles, the cost would be distorted and an inflated value for customs purposes placed on them; that the buying rate to be used is that which is in fact applicable to the particular transaction and that to look to other transactions for the buying rate is to make a valuation of a wholly hypothetical import, not a valuation of the actual one before the collector of customs.

Similarly, in the instant case, the object is to find the value of the imported merchandise and such value would be distorted if the selling price of merchandise from other countries were taken into account, since the cost of labor, materials, and transportation from such other countries would be different. The resulting valuation would be of a wholly hypothetical import, not a valuation of the actual one before the court.

For the above stated reasons, I find that the importer has presented sufficient evidence to negative the existence of a United States value for the imported merchandise.

I turn now to the evidence of the cost of production. First, as to the cost of the fish. It appears from the affidavit of R. J. Cabrál that the total amount paid the fishermen was $20,649.70; that the sum of $1,350 was charged back against them for worthless fish; that $848.86 represented the value of fertilizer produced from parts of the fish that were not canned, making the net cost of the fish $18,450.84. This is in substantial agreement with the amount given in the report of Treasury Representative De Lagrave (exhibit A), namely $18,032.98. Since 8,567 cases were packed, the average cost of the fish per case was $2.1537 or 10.7685 Mexican pesos. [It is stated in the affidavit of Mr. Cabrál that the conversion rate used by Cía de Productos Marinos was 5 Mexican pesos to 1 United States dollar. That rate is used throughout this decision.]

Plaintiff claims, however, that an item of $4,671.40 is also deductible from the total cost. It appears from the affidavit of Mr. Cabrál that payments were made to the several boats which caught the fish as the season progressed, but that the master of the "Vigilante" complained of the price he had been receiving and obtained an adjustment in the sum of $4,671.40 at the end of the season, after all the fish had been caught and delivered. Plaintiff claims that this was a bonus or a gift since the cannery was not legally liable to make the payment and did so only to retain the master's good will for future seasons. However, since it was an actual cost to the producer, whether necessary or not, I find that it must be included in the cost of the materials.

The cost of the other materials, omitting the containers, is stated in the affidavit of Mr. Cabrál and the report of Mr. De Lagrave to be a total of 19,962.92 Mexican pesos, or 2.3302 Mexican pesos per case.

The cost of the labor at the plant is given in said affidavit and said report as a total of 15,396.88 Mexican pesos or 1.7972 Mexican pesos per case.

The affidavit and the report show that the actual general expenses for 1942 were a total of 63,450.25 Mexican pesos or 4.70 Mexican pesos per case. The affidavit of Mr. Cabrál states that this figure was abnormally high because of the wartime conditions and an unusually low pack and that the normal overhead was 2.40 Mexican pesos per case. However, I find that the actual general expenses for the year 1942 must be taken rather than an amount based upon costs in other years.

The affidavit of Mr. Cabrál gives the cost of the cartons and cans as $1.0225 or 5.1125 Mexican pesos per case. The report of Mr. De Lagrave is in substantial agreement. Plaintiff claims, however, that this cost should not be included because the containers were

American goods returned and were separately entered upon the invoice. However, section 402 (f) (3) provides specifically that the cost of all containers and coverings, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, must be included in the cost of production, and no exception is made for American containers. It is to be noted that section 402 defines the statutory forms of dutiable value, and in each instance the definition includes the cost of all containers and coverings, except in the case of United States value where the words "packed ready for delivery" are used. Such costs are elements to be considered in appraising the merchandise. See *T. Oshima* v. *United States*, 61 Treas. Dec. 1243, T. D. 45741.

To recapitulate the costs:

| | | |
|---|---|---|
| Cost of the fish, per case | 10. 7685 | Mex. pesos |
| Cost of other materials, per case | 2. 3302 | " " |
| Cost of labor | 1. 7972 | " " |
| General expenses | 4. 70 | " " |
| Cost of containers | 5. 1125 | " " |
| Total cost | 24. 7084 | " " |

To these costs must be added an item for profit. Section 402 (f) (4) provides:

An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

From the record herein it appears that the exporter was the sole producer of canned tuna fish in Mexico. Under those circumstances it has been held that the profit ordinarily made by the manufacturer of the imported merchandise may be used in arriving at the statutory cost of production. *United States* v. *Henry Maier*, 21 C. C. P. A. 41, T. D. 46378; *United States* v. *F. B. Vandegrift & Co., et al.,* 26 C. C. P. A. 360, C. A. D. 42; *United States* v. *Draeger Shipping Co., Inc.,* 6 Cust. Ct. 783, Reap. Dec. 5118, affirmed 29 C. C. P. A. 258, C. A. D. 199.

The affidavit of Mr. Cabrál states that the ordinary profit for packing tuna has been less than 8 per centum; that because of exceptional conditions and a greater demand, higher prices were received for the Mexican pack during 1942 with resulting high profits, but no profit was realized on the American pack in 1942, and none on either the Mexican or the American pack in 1941; that in 1940, the profit was 1.89 Mexican pesos or $0.38 per case, which represented 13 per centum of the cost of materials, labor, and general expenses; that an

examination of the records of the company showed that before he · became manager the profit was about 7½ per centum.

The report of Mr. De Lagrave states that at the time the manufacturer made its contract with the importer, it had calculated that its cost of production during 1942 would be 15.8317 Mexican pesos per case; that the selling price was calculated to yield the following profit: $0.65 per case on yellowfin, $0.40 per case on standard, and $0.20 per case on flakes; that the real cost was not 15.8317 Mexican pesos but 23.2079 Mexican pesos; therefore, no profit, but a loss, resulted.

The Government claims that since the record shows that the so-called solid packs sold for 48.50 Mexican pesos per case and the flakes for 41.50 Mexican pesos per case, the average profit was 109 per centum and 79 per centum, respectively. However, these prices were obtained for the Mexican pack only and appear to represent an extraordinary profit under unusual circumstances. The contract price for the American pack was $6.70 for the fancy solid pack, $6.45 for the standard pack, and $6.25 for the flakes. These prices were duty paid prices and were predicated upon an importation duty not to exceed $1.50 per case. Thus the amount received by the manufacturer for the fancy solid pack was $5.20 or 26 Mexican pesos. The cost including containers as indicated by the above-stated figures equals 24.7084 Mexican pesos per case. Therefore, the manufacturer made a profit of approximately 1.30 Mexican pesos or 5 per centum on the fancy solid pack. On the standard, the manufacturer received $4.95 or 24.75 Mexican pesos, making no profit and suffering no loss. On the flakes, the manufacturer received $4.75 or 23.75 Mexican pesos, thus suffering a loss of .95 Mexican pesos.

The record establishes, therefore, that no more than a slight profit, if any, was made on the American pack in 1942 and that the profit ordinarily made was not more than 13 per centum and was generally below the statutory minimum of 8 per centum. · I hold therefore that the amount of profit to be added is 8 per centum of the cost of materials, the cost of fabrication, and the usual general expenses. This amounts to 1.5676 Mexican pesos, making a total cost of production of 26.2760 Mexican pesos per case.

For the reasons stated I make the following findings of fact and conclusions of law:

(1) That the merchandise herein consists of canned tuna fish exported from Mexico on April 26 and July 8, 1942.

(2) That the imported merchandise is not similar to the canned tuna fish packed for the Mexican market; consequently no foreign value exists.

(3) That the exporter sold its entire output to the plaintiff and no sales or offers to sell for exportation to the United States were made by it; consequently no export value exists.

(4) That there was no prototype merchandise in the United States available for offer at or near the date of exportation; consequently no United States value exists.

(5) That the cost of production, as that value is defined in section 402 (f) of the Tariff Act of 1930, is the proper basis for determining the value of the merchandise herein.

(6) That the cost of production of the merchandise herein is 26.2760 Mexican pesos per case.

Judgment will be rendered in accordance with this decision.