UNITED STATES *v.* MARINE PRODUCTS CO.

No. 7830.—

Entry Nos. 68; 3.

First Division, Appellate Term

(Decided May 15, 1950)

*David N. Edelstein*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellant.

*Harper & Harper* (*Lawrence A. Harper* and *George R. Tuttle* of counsel), *Benjamin Shipman*, associate counsel, for the appellee.

Before EKWALL, COLE, and MOLLISON, Judges; MOLLISON, J., dissenting

COLE, Judge: The following tabulation shows the three kinds of tuna, packed in cases of 48 cans, that were included in the two shipments, the first exported on April 26, 1942, and the second on July 8, 1942, from Mexico to San Diego, Calif., the subject of this litigation:

|  | Invoiced and entered U. S. $ per case | Appraised Mex. pesos per case |
|---|---|---|
| Yellowfin | 3. 817 | 48. 50 |
| Striped | 3. 645 | 48. 50 |
| Yellowfin or striped flakes | 3. 511 | 41. 50 |
|  | Plus American cases and cans | Net. packed, U. S. cans and cases included |

The importer made entry on the basis of cost of production, section 402 (f) of the Tariff Act of 1930 (19 U. S. C. § 1001, sec. 1402 (f)). The appraiser adopted foreign value, section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U. S. C. § 1001, sec. 1402 (c)).

The issue is now presented as a review of the decision of Cline, J., 22 Cust. Ct. 371, Reap. Dec. 7647, sustaining the claim for cost of production and holding such statutory value to be 26.2760 Mexican pesos per case. The Government (appellant) contends that the trial judge erred: "1. In not finding and holding that the foreign value was the proper basis for determining the dutiable value of the imported merchandise. 2. In finding and holding that the importer has established that there was no United States value for the involved merchandise. 3. In finding and holding that cost of production was the proper basis for determining the dutiable value of the involved merchandise. 4. In adding the statutory profit of 8% to the other items to arrive at the cost of production. 5. In not adding 109% and 79% to the cost, materials, labor and overhead of solid pack and flakes, respectively, as the profit which ordinarily is added in the case of merchandise of the same general character as the particular merchandise under consideration in 1942, prior to exportation. 6. In entering judgment contrary to the facts and law."

The case has been the subject of much litigation. We borrow from the decision of Judge Cline, Reap. Dec. 7647, *supra*, wherein the history of the proceedings is set forth very completely as follows:

"The case was originally heard at San Diego, Calif., on October 6, 1944. Thereafter, a decision was rendered by Chief Judge (then Presiding Judge) Oliver sustaining the values found by the appraiser,

*Marine Products Co.* v. *United States*, 19 Cust. Ct. 243, Reap. Dec. 7373. As to reappraisement No. 151858–A, it was held that no foreign value existed since there were no sales or offers for sale for home consumption on or about the date of exportation of that shipment, and that there was no export value since the exporter's entire output was sold to the importer herein. The court found, however, that the plaintiff had failed to show that there was no United States value of similar tuna fish, stating:

\* \* \* Having proved that the sales in the United States of this Mexican tuna fish were confined to one purchaser, and that *identical* merchandise was not freely offered to all purchasers, establish only that no United States value was created by the sales or offers for sale of *such* merchandise. This record is silent as to whether or not any *similar imported* tuna fish is offered for sale in the United States within the definition of United States value. [Italics quoted.]

The values found by the appraiser were therefore sustained.

"As to reappraisement No. 151859–A, the court found that a foreign value did exist and that such value was represented by the value found by the appraiser. The court said:

"It would seem that, even if it were agreed that the so-called Mexican pack and the American pack were not similar for customs purposes, this record does not establish that all of the merchandise involved in the sales reported by the customs agent in exhibit B was of the Mexican pack. It would seem from this record that all, excepting possibly the one sale made to Pando on August 12, 1942, at his contract price, was either of American-pack tuna fish or merchandise similar thereto for customs purposes.

"Thereafter, a motion was made by the plaintiff for a rehearing on the ground that the burden is not upon the importer to show lack of sales of merchandise other than Mexican tuna fish; that when foreign value was shown not to exist, the burden of proceeding to prove United States value was on the Government; that if the court concluded that the burden of proceeding was upon the importer, that constituted a new construction of the statute. The motion for a rehearing was granted."

The decision of Judge Cline contains a thorough and accurate analysis of the proof introduced by both parties. The lower court's review of the evidence serves our purpose. It is therefore quoted in full:

"At the original hearing Lucian K. Small testified that he was the president of Marine Products Co., which company was engaged in the importation and distribution of canned seafood products imported from Mexico; that he was familiar with the conditions surrounding the production and sale of canned tuna fish in Mexico and the United States; that from 1935 to 1938 his company virtually operated on a cost-plus basis the tuna fish cannery at Cape San Lucas, Mexico; that as to the importations before the court, he had made a contract

with Compañía de Productos Marinos, a Mexican company, to purchase their entire output for the season; that in 1942 there was only one tuna-packing plant operating in Mexico, the one at Cape San Lucas; that he knew of no other importers of Mexican tuna into the United States in 1942; that he had a verbal agreement with Westgate Sea Products Co. to sell it whatever tuna he purchased in Mexico in 1942. He explained that there are three grades of tuna sold to the United States, the fancy solid pack, the standard, and the flakes, and two grades sold in Mexico, the standard and the flakes; that the tuna fish sold to the United States had to meet the standards of the Food and Drug Administration; that the same standards are not required in Mexico and tuna can be used for the Mexican market which could not be used for export to the American market; that for the Mexican market they use what is called 'green bellies' which are fish that have rotted, and fish which are honeycombed from being held too long on ice, and fish which have been shipped for the American market but have been rejected by the Food and Drug Administration; that they have standards here as to how dark-colored the fish may be; that very often small animals or insects get into the Mexican pack and it is not objected to seriously by the Mexicans but would be condemned by the Food and Drug Administration; that in his opinion, from practical experience in the trade and experience with both packs, the Mexican pack and the American pack are not commercially interchangeable in the wholesale trade and commerce in the United States. He stated further that there is a terrific sales resistance to this merchandise because it is a product of Mexico; that it was overcome by importing it unlabeled and selling it to an American buyer who had a well-known, highly advertised label.

"On cross-examination the witness testified that the merchandise was sold to Westgate because it paid more for it; that it was not offered to anybody else; that the solid pack yellowfin tuna was sold at $13 per case, the striped at $11, and the flakes at $10. He stated that he was familiar with the Mexican brands 'Calmex' and 'Promar'; that they were canned in the same cannery as the American pack; that as a general practice they were not canned from the same fish; that there might have been some cases that were as good as the American pack, but the pack as a whole was not; that the can for the American market had to come up to a specified standard and the can for the Mexican market did not; that if the Mexican cans were sold at a higher price than those imported into the United States, it was because he had a contract to buy the American pack at a specific price and the market went up very rapidly in Mexico.

"The witness further testified that 80 cases of imported merchandise were rejected by the Food and Drug Administration; that they were re-exported to Mexico and sold there at the regular price.

"The contract between Marine Products Co. and Compañía de Productos Marinos (exhibit 1) provides that the former shall buy and the latter shall sell all of the tuna packed by it at its plant during the season commencing February 1 and ending June 30, 1942, at the following net prices f. o. b. dock San Diego, freight, insurance, and importation duties paid: Fancy solid pack yellowfin or skipjack tuna at $6.70 per case; standard yellowfin or skipjack tuna at $6.45 per case; and flakes at $6.25 per case; that all tuna is to be of first class quality and condition and passed by the United States Department of Agriculture Food and Drug Administration.

"Edward W. Chapman, Jr., called as a witness for the plaintiff, testified that he is the vice president and sales manager of Westgate Sea Products Co.; that that company deals in canned fish, including tuna; that he has been engaged in that actively 17 years; that he is familiar with both the tuna packed for the Mexican trade and that packed for the American trade; that the Mexican pack is not commercially comparable with the American pack; that his company had an oral contract with Marine Products Co. to take the whole pack imported by the latter in 1942; that his company put its labels on it and sold it; that it was sold very quickly, within a week at the maximum; that his company's label made it possible to sell the tuna at a premium because it is a highly advertised label; that with some other label, it would have brought a lower price, and with a Mexican label, it would have sold at a loss.

"The affidavit of R. J. Cabrál (exhibit 2) states that he has been the general manager of Cía de Productos Marinos, S. de R. L. for 3 years; that that was the only tuna plant operating in Mexico during 1942; that the plant put up two separate packs of tuna during 1942, one for the Mexican market and one for the American market; that the American pack was in three grades: (1) Fancy solid pack yellowfin consisting as nearly as possible of one solid chunk of tuna; (2) standard, consisting of yellowfin or skipjack tuna containing two or more solid pieces with flakes to fill in; (3) yellowfin or skipjack flakes consisting of small broken pieces; that the Mexican pack normally consisted of skipjack tuna and was put up in two grades, standard and flakes. The affidavit also states:

"\* \* \* When an American pack was being prepared no Mexican pack was intentionally put up although sometimes tuna which did not prove to meet American standards would find its way into the Mexican market (see below). When a Mexican pack was being prepared no American pack was put up. As more fully set forth below, the tuna packs were graded differently, met different standards, were sold separately and were not commercially interchangeable.

\* \* \* \* \* \* \*

"In the packing of such tuna for the American market great care was taken to comply with the American Pure Food and Drug Administration standards. In so far as possible all insects were kept out of the cans. Only the fish in the freshest

condition was used and instructions were given that in the case of any doubt the fish should not be included in the American pack.

"* * * In preparing the Mexican pack in 1942 skipjack and yellowfin were used interchangeably. The American trade is particular about the whiteness and solidity of the fish, consequently fish which although perfectly edible had become somewhat darker in color and softer in texture while being kept on ice, could not be used for the American pack, but was entirely acceptable to the Mexican trade. Moreover the American Pure Food and Drug authorities were extremely fastidious on these and all other matters, and if doubts should arise as to the acceptability of certain fish, tuna which might have been put in a can bearing an American embossing in English would be given a Mexican label and sold in the Mexican market.

"The tuna sold in the Mexican market was not commercially comparable with the tuna exported to the United States. It was not packed to meet the American Pure Food and Drug standards. In fact 80 cases of tuna which had been intended for the United States and were rejected by the American Pure Food and Drug authorities were returned to Mexico and sold in the Mexican market, after Mexican labels had been attached.

"At the rehearing, plaintiff called R. O. Leeber who testified that in 1942 he was captain of a tuna-fishing vessel, the 'Vigilante'; that the fish he caught off his boat consisted of skipjack, black skipjack, yellowfin, and bonito; that canneries buy as tuna, the skipjack, the yellowfin, the bluefin, and the albacore; that the black skipjack and the bonito were different fish, not bought as tuna. Captain Leeber stated further that as the fish were caught they were left on deck or run into the hold; that they were not packed in ice; that as the boat was then from 12 to 14 hours from the cannery, the fish were in very poor condition when they arrived; that as the climate is warm, the fish should have been packed in ice within 3 or 4 hours after they were caught, but that the cannery was not able to supply sufficient ice for that; that on arrival the fish were soft, not firm, and were burned, that is, partially cooked, due to the warm weather and the heat of the engine room walls; that such fish would start to decompose; that little holes would show up through the fish; and that such fish are called honeycomb fish.

"Captain Leeber stated that he brought approximately 130 to 135 tons of fish to the cannery during 1942; that between 13 and 15 tons were rejected; that he was informed by the cannery that the fish were in very bad condition and would be used only for the Mexican pack; that the rejection of certain fish was due to their condition, not to the kind of fish.

"Victor Manuel Chiapa testified that he had been superintendent of a cannery at Cape San Lucas in 1941 and 1942; that when packing for exportation to the Marine Products Co. they canned yellowfin tuna and skipjack; that for the Mexican market they canned yellowfin, skipjack, black skipjack and bonito; that the pack for the United States consisted of a yellowfin fancy pack containing big chunks only and the best of the meat, the yellowfin standard consisting of the

head part and chunks and a certain percentage of flakes, not higher than 14 per centum, and some packs consisting of flakes alone; that for the Mexican market they canned the yellowfin fancy pack only a few times; that in the standard pack for the Mexican market the amount of flakes was larger, amounting to as high as 30 per centum; that flakes were also packed for the Mexican market.

"The witness also testified that Captain Leeber's was not the only boat which brought fish to the cannery; that they had another boat, the 'Magnolia'; that the 'Magnolia' carried ice and also had an ice machine; that the fish brought in by the 'Vigilante' were packed for the Mexican market; that that included black skipjack and bonito; that the cans used for the Mexican pack were embossed on the top 'Producto Nacional'; that the marking on the cans used for the American pack was 'Product of Lower California, Tuna in Oil'; that sometimes the lids marked 'Product of Lower California' were also used for the Mexican pack; that a label was always applied to the Mexican cans, but never to the American ones; that in canning for the United States, they always picked the best and the fresher fish, but for the Mexican pack they used fish that were not so firm, sometimes a little sunburned, and sometimes just about starting to honeycomb; that they used portions of the fish in the Mexican pack not used in the American, such as the parts of meat behind the gills, parts of the tail, and the bellies; that that pack was not strictly first class 'because we could pass that pack even with small spots of dark meat and blood for the Mexican market.'

"On cross-examination Mr. Chiapa stated that they did not put any decomposed meat in the Mexican pack, but it was not as good quality; that honeycombed fish can be canned for the Mexican market; that the American pack and the Mexican pack were different in appearance and that softer meat was used for the Mexican pack, but that it was just as wholesome.

"W. Wade Ambrose, president and general manager of Westgate Sea Products Co., testified that the packing and sale of tuna fish was subject to control by the Food and Drug Administration and the Federal Trade Commission; that the former checks to see if the pack is fit for human consumption and the latter promulgates trade practice rules; that the fish that may be packed commercially as tuna in this country are the albacore, the yellowfin, the skipjack or striped tuna, and the bluefin; that the black skipjack and the bonito are not used or sold as tuna in this country; that a can of standard yellowfin consisting of chunks and about 14 per centum flakes would not be accepted as a good delivery for fancy solid yellowfin; that a can containing 30 per centum flakes would not be acceptable as good delivery for the standard can; that following the Federal Trade Commission's trade practice, the standard which he sold consisted of

yellowfin or striped tuna in solid chunks up to 75 per centum and about 25 per centum small pieces or flakes; that cans containing as much as 30 per centum flakes would not be good delivery for the standard under Federal Trade Commission practices, nor would cans containing pieces of skin, bones, or clots of blood be accepted as good delivery for an order of flakes; that the portion of tuna sold to him for Mexico in 1942 as fancy yellowfin met the requirements of a fancy pack as he knew them; that the portion sold as standard met the requirements of a standard pack; that the portion sold as flakes met the requirements for flakes.

"Mr. Lucian K. Small, recalled as a witness, stated that his company imported 4,926 cases of canned tuna from Mexico during 1942; that it was purchased from the cannery at Cape San Lucas known as Compañía Productos de Marinos; that it was sold to the Westgate Sea Products Co.; that there was no other Mexican tuna on the market in San Diego during 1942; that he did not recollect receiving any striped solid pack tuna; that of the solid pack they received yellowfin tuna; that the packs enumerated in exhibit B, namely, yellowfin solid, yellowfin flakes, striped solid, and striped flakes, did not constitute all of the types which he purchased under his contract; that he also imported striped or skipjack standard type; that the striped tuna standard pack was marked 'SC'; that his company paid the duty on the 4,926 cases, but was reimbursed by the canner for any duty over $1.50.

"Defendant introduced into evidence as exhibit A, a report of Treasury Representative D. J. De Lagrave, dated March 27, 1943. This contains a summary of information obtained from Roméo Jimenez Cabrál, general manager of the Compañía de Productos Marinos, verified by an examination of the company's books relative to the cost of production.

"Exhibit B is a report of customs agent Benjamin S. White, Jr., dated November 30, 1942. It states that the Compañía de Productos Marinos had entered into a contract with the Marine Products Co. for the sale of its entire output; that it also had a signed agreement with E. Pando y Cía, Mexico, to deliver 15,000 cases of 'Calmex' solid pack tuna and 1,800 cases of 'Promar' tuna fish flakes; that sales to the United States were restricted to the Marine Products Co.; that regular wholesale sales were made in Mexico; that an examination of the sales records revealed continuous sales since June 15, 1942; that no difference was made in price on account of the quantity purchased; that Mr. Cabrál stated that his company endeavored to sell only a small percentage of its products in Lower California and that he tried to restrict the quantity of the sales; that 'Calmex' was sold at 48.50 pesos per case and 'Promar' at 41.50 pesos per case. The report

contains a list of all sales made by the company in Mexico since June 15, 1942."

The uncontradicted statement in the special agent's report, exhibit B, *supra*, that no sales were made in Mexico prior to the first shipment under consideration, on April 26, 1942, is sufficient to establish that at the time of exportation of that merchandise (reappraisement 151858–A) no foreign market existed therefor. The argument in Government counsel's brief that "There might have been sales in the latter part of 1941, which could have affected the value herein," or that "The absence of sales in the early part of 1942 might have been due to the fact that there were two seasons for packing," cannot be accepted as contradicting the Government's competent evidence.

That the proof also shows the imported products to be dissimilar to the comparable ones sold for home consumption in the Mexican market, as found by the trial court, supplies additional reason for removing foreign value as the proper basis for appraisement. In this connection, much emphasis is to be given to the authority exercised by the Food and Drug Administration and the Federal Trade Commission, whose requirements control the type and quality of canned tuna fish from Mexico. The standards maintained by both Federal agencies demand for the market of this country a superior class of merchandise, and eliminate entirely from the product sold for export not only the undesirable soft and honeycombed fish but also parts of tuna where the poorer grade of meat is found. Only selected qualities and particular varieties of tuna are sold for export, while the product sold for home consumption in Mexico is unrestricted.

*United States* v. *Luigi Vitelli Elvea, Inc., et al.*, 11 Cust. Ct. 437, Reap. Dec. 5941, concerning dutiable value of canned tomatoes from Italy, involved an analogous situation. In that case, it was shown that the tomato products sold for export were processed to meet regulations of the Department of Agriculture, governing the quality of the merchandise and the method of packing. The merchandise sold for home consumption in the Italian market had no such standards. In holding the two products not to be similar for valuation purposes, the court said that the decisive factor was the element of substitution, and that while the export pack might have been substituted for the home-consumption pack, the reverse was not true because the product sold for home consumption in Italy would not meet the American standards. The same is equally applicable to the canned tuna fish sold in the Mexican market for home consumption, and that exported to the United States.

That the Mexican pack and the American pack are used for the same purpose—to be eaten as food—is not the criterion for holding merchandise to be similar. *United States* v. *Kraft Phenix Cheese Corp. et al.*, 26 C. C. P. A. 224, C. A. D. 21. There, imported "Portion"

Roquefort cheese was held to be dissimilar to "Standard" Roquefort sold for home consumption in the foreign market because each was subjected to different treatment resulting in varying properties for both. Here, the Mexican pack includes different types of tuna as well as various parts of the fish not permitted in the American pack.

*United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, T. D. 42837, states that "The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available."

The rejection by the Food and Drug Administration of 80 cases of the imported product and its ultimate return to the Mexican market where it was sold at the regular price is further evidence of dissimilarity under the *Wecker & Co.* case, *supra.*

The distinctions between the two products are not, as Government counsel characterizes them, "slight and rather insignificant variations." On the contrary, they are material differences, sufficient under the cited authorities to create dissimilarity for appraisement purposes.

Appellant assigned no error to the lower court's decision as it excluded export value. The subject is therefore not before us for discussion.

Considering the matter of United States value, section 402 (e) of the Tariff Act of 1930 (19 U. S. C. § 1402 (e)),[1] we revert, first, to the original decision, Reap. Dec. 7373, *supra*, in which Chief Judge Oliver found that "This record is silent as to whether or not any *similar imported* tuna fish is offered for sale in the United States within the definition of United States value." The conclusion gave rise to the question whether canned tuna fish imported from countries, other than Mexico, can be regarded as *similar* under the statutory definition of United States value.

The issue is discussed in Judge Cline's decision, Reap. Dec. 7647, *supra*, on the principle that United States value is intended by Congress to be a constructive foreign value, which is expressly limited to conditions in the country of exportation of the merchandise subject of

---

[1] (e) UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale for domestic consumption, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

appraisement. Pertinent authorities cited therein justify the conclusion that "the object is to find the value of the imported merchandise and such value would be distorted if the selling price of merchandise from other countries were taken into account, since the cost of labor, materials, and transportation from such other countries would be different. The resulting valuation would be of a wholly hypothetical import, not a valuation of the actual one before the court." *United States* v. *Robert Reiner, Inc.*, 35 C. C. P. A. 50, C. A. D. 370, the latest expression on United States value, states that "Similar merchandise, of course, must be such as to properly reflect the true value of the imported merchandise being appraised."

All of the Mexican canned tuna fish sold in the United States during 1942 was imported by Marine Products Co., the importer of the present merchandise. Because of heavy sales resistance to Mexican canned tuna fish in this country, with consequent financial loss in sales promotion, the shipments were imported unlabeled and sold by the importer in the same condition. The merchandise was not freely offered, but was sold, under the terms of a verbal agreement to one purchaser, Westgate Sea Products Co., who used its own label because its consumer value was higher than any other label.

The foregoing set of facts negative the existence of United States value, section 402 (e), *supra*. First of all, such statutory value contemplates, among its essential elements, a value based upon prototype merchandise *freely offered for sale*. *United States* v. *New York Merchandise Co., Inc.*, 31 C. C. P. A. 213, C. A. D. 274, and the *Robert Reiner, Inc.*, case, *supra*. The earlier of the shipments in question was the first of its kind, and neither importation was freely offered. Both were restricted to one company, and sold thereto. Furthermore, the price at which the single purchaser ultimately sold its merchandise in the United States market was not the value of the imported product *per se*, but rather the "good will" application of a recognized commercial label, which was attached after importation and subsequent to the disposition of the merchandise by the importer to the exclusive purchaser. The imported shipments consisted of unlabeled cans of tuna fish. Using a label that made the commodity a commercially profitable article, had the effect of changing its condition from the time of importation. Therefore, under the fundamental principle that dutiable value is based on the condition of merchandise as imported, *American Sugar Refining Company* v. *United States*, 181 U. S. 610, and *United States* v. *Fritzsche Bros., Inc.*, 35 C. C. P. A. 60, C. A. D. 371, the price at which the labeled cans were sold is immaterial to the present case.

The conclusion by Cline, J., holding that no statutory United States value existed for the merchandise under consideration, is adopted.

Cost of production, section 402 (f) of the Tariff Act of 1930 (19 U. S. C. § 1402 (f)),[2] becomes the next consideration. As disclosed by the assignment of errors referred to herein, the item of profit is the only one in dispute. The parties have accepted the trial court's findings of the statutory elements included in paragraphs (1), (2), and (3) of section 402 (f), *supra*, which appear in the decision as follows:

| | | |
|---|---|---|
| Cost of the fish, per case | 10. 7685 | Mex. pesos |
| Cost of other materials, per case | 2. 3302 | " " |
| Cost of labor | 1. 7972 | " " |
| General expenses | 4. 70 | " " |
| Cost of containers | 5. 1125 | " " |
| Total cost | 24. 7084 | " " |

Determination of the item of profit is to be made from the operations of the Mexican exporter of the instant merchandise, the sole manufacturer. The amount of the profit is to be that usually added and not what was "estimated." *United States* v. *Jovita Perez*, 36 C. C. P. A. 114, C. A. D. 407.

The finding of the trial judge was based entirely upon the price for the American pack paid by the importer under its contract, exhibit 1, with the foreign exporter. The computations disclosed that "no more than a slight profit, if any, was made on the American pack in 1942," so the court applied the minimum of 8 per centum as required under the statute, section 402 (f) (4), *supra*. No consideration was given to prices obtained for the Mexican pack because they appeared "to represent an extraordinary profit under unusual circumstances," the conclusion being based on testimony in the affidavit, exhibit 2, to the effect that exceptional conditions and a greater demand brought increased prices for the Mexican pack in 1942 with resulting higher profits.

The basis for finding the cost of materials, etc., included in paragraph (1) defining cost of production, section 402 (f), *supra*, was not the same as that applied in determining the usual general expenses,

---

[2] (f) Cost of Production.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

intended by paragraph (2) of the said statutory definition. The calculations for the cost of labor, fish, and other materials, as hereinabove set forth, were based on an output of 8,567 cases, the quantity *packed from February to August 1942, inclusive.* The figure taken for general expenses is based on 13,500 cases, *the total pack for the calendar year of 1942.* No error has been assigned to the procedure followed by the trial judge on the matter of "usual general expenses," so the subject is not a proper one for discussion in this proceeding. However, the force and effect given to that phase of the Mexican market under consideration should also apply to all elements, including the prices for the Mexican pack, which are pertinent toward proper determination of the item of profit in dispute.

Where, as in the present case, there is only one foreign manufacturer or producer of the merchandise to be appraised and sales thereof were made both for home consumption and for export, then determination of profit under statutory cost of production is based on the amount realized where the greater quantity of the product is sold. *J. H. Cottman & Co.* v. *United States* and *United States* v. *J. H. Cottman & Co.,* 20 C. C. P. A. 344, T. D. 46114, and *F. W. Berk & Co., Inc.* v. *United States,* 16 Cust. Ct. 365, Reap. Dec. 6282.

In the *Cottman* case, *supra,* the Cherifien Government was the sole producer of rock phosphate in the French protectorate of Morocco. Its sales aggregated 1,198,006 tons, of which 70,000 tons were outside Europe, 14,608 in Morocco, and the remainder in Europe. The court held that "sales to European countries should be taken as the measure of the 'profit which is ordinarily added.'"

The *Berk & Co., Inc.,* case, *supra,* presented a similar set of facts concerning crude ammonium sulphocyanide, and followed the *Cottman* case, *supra,* which was cited with approval.

In this case, the general manager of the Mexican manufacturer states, in his affidavit, exhibit 2, *supra,* that, during the calendar year of 1942, his company packed 13,500 cases of canned tuna fish, of which, as appears from the testimony of the president of the importing corporation, 4,926 cases comprised the American pack, and were on the market of San Diego during that period. Although the record contains no positive proof concerning the disposition of the remaining 8,574 cases, it is fair to assume, on the basis of the evidence herein, that they were sold in Mexico. Under the *Cottman* and *Berk* cases, *supra,* the profit realized on the Mexican pack is the amount to be added under the provisions of section 402 (f) (4), *supra.*

The special agent's report, exhibit B, states that the selling price in Mexico for the standard solid pack tuna was 48.50 Mexican pesos per case, and for the flakes, 41.50 Mexican pesos per case. The statement is substantially supported by the list of sales included in the report. In this connection, it should be added that no consideration

is given to the sales made to E. Pando y Cía, which were at " 'special' prices, and were made because E. Pando y Cía finances the operations of the Compañía de Productos Marinos [the Mexican manufacturer]."

The rejection of such sales does not conflict with any statutory construction to be found in the *Jovita Perez*, the *Cottman & Co.*, and the *F. W. Berk & Co., Inc.*, cases, *supra*. It is true that in the *Jovita Perez* case the Pepsi-Cola Company, a domestic corporation, organized the Mexican company for the purpose of manufacturing sirup used in "Pepsi-Cola," and that all sales by the foreign manufacturing organization were made to its affiliate in the United States, but the important phase of the relationship, for the purposes of this discussion, is that the transactions were regular sales at a definite price, and there was no element of "special" price, as we find herein. The court's holding "that the profit usually added is the profit actually added" cannot be interpreted as a willingness to consider sales at *special* prices for a *special* consideration, like those to the said E. Pando y Cía, in computing "profit which ordinarily is added" under section 402 (f) (4), *supra*.

What has been said concerning the types of sales disclosed in the *Jovita Perez* case, *supra*, is also true with respect to the *Cottman & Co.* and *F. W. Berk & Co., Inc.*, cases, *supra*. In neither of them is there the slightest suggestion that any sales were made at other than the regular price charged in the ordinary course of trade.

Here, however, the proof is uncontradicted that the sales to E. Pando y Cía were within a separate category, made at admittedly "special" prices, and to a particular individual for an extraordinary consideration, i. e., financing the operations of the manufacturer. To recognize such transactions and accept them as controlling of the present issue, would be to sanction a practice that would permit organization of "dummies"—call them "finance companies"—to whom "sales" might be recorded at unusually low prices from which a fictitious profit could be rigged. The illustration is not an inference of what happened in this case. It is given to emphasize that we cannot apply to said section 402 (f) (4) a congressional intent to allow as considerations in finding profit in the determination of statutory cost of production, a peculiar set of transactions to one financially interested in the business operations of the exporter.

The cost to the Mexican manufacturer of a case of canned tuna was 23.2079 Mexican pesos, so the profit realized—selling prices less cost—in terms of percentage was 109 per centum on the standard solid pack and 79 per centum on the flakes. Following the statutory formula, section 402 (f) (4), *supra*, and applying said percentage rates to the total of the amounts held by the trial court and accepted by the parties as correct for paragraphs (1) and (2) of section 402 (f), *supra*, we find 21.3595 pesos for the standard solid pack and 15.4807 pesos

for the flakes, which we hold to be the amounts of profit to be added to the cost of materials, the cost of fabrication, and the usual general expenses, as found by the trial court, in determination of the cost of production of the merchandise in question.

Applying the amounts as above specified, we find the statutory cost of production for the merchandise invoiced as "Yellowfin" or as "Striped" to be 46.0679 Mexican pesos per case, and for the product invoiced as "Yellowfin Flakes" or "Striped Flakes" to be 40.0891 Mexican pesos per case.

Counsel for appellee, in their brief, argue that the percentages of 109 per centum and 79 per centum, as determined herein, are basically unsound because the result does not equal any of the sales prices reported by the special agents, exhibits A and B. Such a condition is of no consequence. Cost of production for valuation purposes is a constructive foreign value and is intended as a substitute therefor. *United States* v. *Henry Maier*, 21 C. C. P. A. 41, T. D. 46378.

For reasons hereinabove set forth, we find as matter of fact and conclude as matter of law:

(1) That the merchandise in question consists of canned tuna fish from Mexico.

(2) That the imported product, or American pack, is not similar to that packed for the Mexican market, and therefore no foreign value, section 402 (c), as amended, *supra*, exists.

(3) That there is no United States value, section 402 (e), *supra*, for the present merchandise because no prototype merchandise, within the meaning thereof under said section 402 (e), was available at the time of exportation of the product under consideration.

(4) That the proper basis for appraisement of the merchandise is cost of production, section 402 (f), *supra*.

(5) That the cost of production for the products invoiced as "Yellowfin" or as "Striped" is 46.0679 Mexican pesos per case, and for the products invoiced as "Yellowfin Flakes" or "Striped Flakes" is 40.0891 Mexican pesos per case.

The judgment of the trial court is modified.

DISSENTING OPINION

MOLLISON, Judge: I regret that I cannot concur in finding of fact and conclusion of law (5) contained in the opinion of the majority, although I am in accord with the preceding findings of fact and conclusions of law (1) to (4), inclusive, and the reasoning which resulted in them.

As stated by the majority, the elements of cost of production covered by paragraphs (1), (2), and (3) of section 402 (f) of the Tariff Act of 1930 as found by the trial court are not in dispute. The only

contested element is that covered by paragraph (4) of said section 402 (f) relating to profit.

The exporter in the instant case was the *sole* manufacturer in Mexico of canned tuna fish at or about the time of exportation of the merchandise involved. Hence, the profit "ordinarily added" under the cost-of-production formula is the profit *actually added by the exporter*. *United States* v. *Jovita Perez*, 36 C. C. P. A. 114, C. A. D. 407.

The trial court based its determination of profit upon the profit made on the American pack, and I agree with the reasoning and conclusion of the majority that under the ruling in the *Cottman* and *Berk* cases, cited in the majority opinion, this was error, and the determination of profit should have been based upon the amount realized where the greater quantity of the product was sold.

The evidence, specifically exhibit 2, the affidavit of the exporter's manager, shows that 13,500 cases of tuna fish were canned by the exporter in 1942. It shows that 4,926 cases were sold for export to the United States, and hence there were 8,574 cases left. The majority presumes, and I believe the presumption is warranted, that they were sold in Mexico. However, the majority adopts the figures of 48.50 Mexican pesos per case as the selling price of the solid pack, and 41.50 Mexican pesos per case as the selling price of the flake pack, and calculates profit from these figures. These prices appear in the report of the customs agent, exhibit B, pages 8 and 9, and are stated to include packing, invoice stamp tax of 8.80 Mexican pesos per thousand pesos of invoice value, and freight from Cape San Lucas to Ensenada, Lower California.

The 48.50 and 41.50 Mexican peso prices are reflected in a tabulation appearing at the end of the report, exhibit B, said to be a list of all sales by the manufacturer from June 15, 1942, to October 15, 1942. According to the report, no record of sales previous to June 15, 1942, was found. The list covers sales of 2,468 cases of tuna fish, of which 442 cases are at the prices noted above, 15 cases at 50 Mexican pesos per case ($10 U. S. currency per case converted at 5 Mexican pesos to one U. S. dollar), 11 cases at 45 Mexican pesos per case, and 2,000 cases at a price of 20.95 Mexican pesos per case sold to E. Pando y Cía of Mexico, D. F., with which firm, it is stated in the report, exhibit B, the manufacturer had a contract to deliver 15,000 cases of solid pack tuna at a price of 20.95 Mexican pesos per case, and 1,800 cases of flake tuna at a price of 16 Mexican pesos per case.

According to paragraph (4) of section 402 (f), *supra*, the addition for profit in the statutory cost-of-production formula is to be—

* * * equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration * * *.

*The majority has omitted from the calculation of profit any consideration of the sales to E. Pando y Cía,* assigning as a reason that such sales to E. Pando y Cía were "at a special price." According to the report, exhibit B, page 3, the said "special" price was made—

\* \* \* because E. Pando y Cía finances the operations of the Compañía de Productos Marinos [the exporter].

In addition, the majority has disregarded the sales of 15 cases at 50 Mexican pesos per case, and of 11 cases at 45 Mexican pesos per case.

It is clear from the report of the customs agent, exhibit B, that between the importer's contract for the entire export pack, and E. Pando y Cía's contract for 16,800 cases of the Mexican pack, the entire output of the cannery in 1942 was really under contract for delivery at fixed prices. It would also appear that, so far as the Mexican pack was concerned, the greater portion thereof was actually delivered under the fixed prices, which resulted in no profit to the manufacturer, but in a loss, this by reason of the fact that the real or actual cost (exclusive of profit) to the manufacturer as shown in the report of Treasury Representative De Lagrave, exhibit A, page 5, was 23.2079 pesos per case.

The following from the foregoing report, which was offered in evidence by the defendant, is very illuminating:

PROFIT

At the time the Cia. de Productos Marinos made its contract with the Marine Products Co. of San Diego, California, the former had calculated that its cost of production during the 1942 season would be 15.8317 Mexican pesos per case. The selling price to the Marine Products Co. was calculated on a basis to yield the packer, the following profit:

$.65 U. S. Cy per case on Yellowfin
$.40   "   "   "   "   "  Standard
$.20   "   "   "   "   "  Flakes

Mr. Cabral informed me that the above were considered as normal rates of profit for these products.

*But the real cost was not 15.8317 pesos but 23.2079 pesos.* This was due to a number of unforseen [sic] events, such as the elimination of the Japanese fisherman, with whom the packer had a contract at a very low price for raw tuna fish. [Italics mine; pp. 4–5.]

The fact that a comparatively small portion—some 468 cases out of 2,468 cases delivered in the period between June 15 and October 15, 1942—was sold at higher prices which resulted in a profit to the manufacturer does not seem to me to be sufficient reason for basing the calculation of profit exclusively upon such higher prices.

The adoption by the majority for the purposes of determining profit to be added of the prices of 48.50 and 41.50 Mexican pesos per case based on the relatively small number of 442 cases out of 2,468 cases sold in the period taken, without including in such calculation the

sale of 2,000 cases of the Mexican pack at 20.95 Mexican pesos per case, is contrary to the applicable rule of law expressed in *J. H. Cottman & Co.* v. *United States* and *United States* v. *J. H. Cottman & Co.*, 20 C. C. P. A. 344, T. D. 46114, and *F. W. Berk & Co., Inc.* v. *United States*, 16 Cust. Ct. 365, Reap. Dec. 6282.

The majority recognizes the validity of these decisions and their applicability, but nevertheless proceeds to disregard the unassailable law enumerated therein by using as a basis for the calculation of the actual profit to be added, the prices received for less than one-fifth (⅕) of the reported sales of the Mexican pack and ignoring the prices received for four-fifths (⅘) of the reported sales of the Mexican pack. In adopting the prices received for the smaller one-fifth portion and ignoring the price received for the very much larger four-fifths portion of the reported sales of the Mexican pack, the majority has unduly distorted the actual profit of the manufacturer and exporter in a manner not warranted by the statute or the law.

In fact, the prices obtained for the 468 cases seem to represent an extraordinary situation because of war conditions in 1942 resulting in an extraordinary profit upon a small portion of the cannery's output. I take note of the fact that 302 of the 468 cases which were sold at the higher prices were sold to purchasers in the border towns of Mexicali and Tía Juana, and the remaining 166 cases were sold to purchasers in Ensenada, which is something of a tourist and holiday resort, which fact seems to high light the conclusion that such sales were extraordinary, rather than ordinary.

I believe that if a calculation of profit is to be made based upon the available evidence with respect to sales in Mexico, the sales to E. Pando y Cía should be taken into consideration as representing the profit ordinarily added by the particular manufacturer. These prices of 20.95 Mexican pesos per case for the solid pack and 16 Mexican pesos per case for the flake pack are less than the bare (without profit added) cost to the Mexican manufacturer of a case of canned tuna as reported by the treasury representative in exhibit A and as found by the majority, i. e., 23.2079 Mexican pesos per case, and hence it would appear that there was a loss instead of a profit realized by the particular manufacturer upon the sales to E. Pando y Cía, which apparently formed the bulk of the sales of the 1942 Mexican pack.

Accepting as a fact the statement in the report, exhibit B, that the prices to E. Pando y Cía were special prices given by reason of the fact that E. Pando y Cía financed the operations of the exporter, I do not believe that that fact affects at all the result of our inquiry into the profit "ordinarily added" by the particular manufacturer. *We are not limited in this inquiry to the profits made upon free offer of the merchandise in the open market;* we are to determine the profit "usually added," and in this case the profit actually added by the

exporter of the merchandise involved herein. *United States* v. *Jovita Perez, supra.* In this case, because of contracts made, the manufacturer sold the bulk of its goods at a loss. There is no suggestion or proof that the sales to E. Pando y Cía were deliberately made at a loss and that hidden profits were ultimately returned to the manufacturer, and under these circumstances I am satisfied that the sales to E. Pando y Cía must be taken into consideration in determining the item of profit.

In arriving at the bare (i. e., without profit added) cost of production, actual as distinguished from statutory, as reported in exhibit A and accepted by the majority, there was no attempt to distinguish the cost of production of the solid pack from that of the flake pack. In his affidavit received in evidence as exhibit 2 the general manager of the exporter states—

Although as packed for the American pack the tuna was divided into three grades: fancy solid pack, standard, and flakes in order of the favor which the different forms were received by the consuming public the fish was bought by the ton and the same price was paid per ounce whether the part of the fish received was an unbroken chunk of yellowfin or a worthless fin or. tail which was suitable merely for use as fertilizer.

It is also indicated that for practical purposes the labor and other costs entering into the production of the solid pack and the flake pack were the same, and that this was true whether the American pack or the Mexican pack was under consideration. It may be said, therefore, that the cost of production was the same whether the product was the solid pack or the flake pack or was for the American or Mexican market.

The two packs, solid and flake, however, brought different prices in the Mexican market. The only evidence of actual sales made in the Mexican market is contained in exhibit B, the customs agent's report, which lists sales made from June 15 to October 15, 1942, of 2,468 cases out of the 1942 Mexican pack of 8,574 cases. Of these 2,468 cases, 2,425 were of the solid pack and 43 were of the flake pack. Of the 2,425 cases of solid pack sold—

> 2,000 cases were sold at 20.95 Mexican pesos per case
> 399 " " " " 48.50 " " " "
> 15 " " " " 50.00 " " " "
> (i. e., @ $10 U. S. cy. converted at 5 to 1)
> 11 cases were sold at 45.00 Mexican pesos per case

All 43 cases of the flake pack were sold at 41.50 Mexican pesos per case.

In view of the fact that no distinction was made in calculating the bare (without profit added) cost of production of the solid and flake packs, it would appear that in order to determine the actual profit made there should be no separate calculation of the profit made on

each pack, that is to say, the total selling price of the 2,468 cases should be divided by 2,468 to determine the actual profit made per case, which profit should be the figure used in the calculation of statutory cost of production.

The total selling price of the 2,468 cases shown in the customs agent's report, exhibit B, was 64,281 Mexican pesos, which, when divided by 2,468 equals a selling price per case of 26.0457 Mexican pesos. Taking the *actual cost of production* as shown in exhibit B, 23.2079 Mexican pesos per case, from the *actual selling price* as shown above, 26.0457 Mexican pesos per case, leaves a profit of 2.8378 Mexican pesos per case.

The court below found, and all agree, that the sum of the amounts involved in the items covered by paragraphs (1) and (2) of the cost-of-production statute is 19.5959 Mexican pesos per case, and as 2.8378 Mexican pesos is an amount in excess of 8 per centum of this sum, it is the addition which is to be adopted as the profit ordinarily added under paragraph (4) of section 402 (f).

The calculation of cost of production under section 402 (f), *supra*, would therefore be as follows:

| Sec. 402 (f), Par. | Item | Amount | |
|---|---|---|---|
| (1) | Cost of fish | 10.7685 | Mexican pesos |
| | " " other materials | 2.3302 | " " |
| | " " labor | 1.7972 | " " |
| (2) | General expenses | 4.7000 | " " |
| (3) | Cost of containers | 5.1125 | " " |
| (4) | Profit | 2.8378 | " " |
| | Statutory cost of production | 27.5462 | " " |

I would therefore support a judgment in the foregoing amount modifying the judgment below accordingly.